Aida GONZALEZ, Plaintiff,

v.

Kenneth S. APFEL,[1] Commissioner
of Social Security, Defendant.

No. 3:97cv1089 (HBF).

United States District Court,
D. Connecticut.

Sept. 22, 1998.

---

1. On September 29, 1997, Kenneth S. Apfel was sworn in as Commissioner of Social Security. Pursuant to Rule 25(d)(1), Fed.R.Civ.P., he is automatically substituted as the defendant in this action.

Ivan Michael Katz, Law Offices of Ivan M. Katz, New Haven, CT, for Plaintiff.

Deirdre Anne Martini, U.S. Attorney's Office, Bridgeport, CT, for Defendant.

## RULING ON PENDING MOTIONS

FITZSIMMONS, United States Magistrate Judge.

Plaintiff, Aida Gonzalez, filed this action seeking review, pursuant to 42 U.S.C. § 405(g), of the decision of the Commissioner denying her claim for Supplemental Security Income ("SSI") benefits under the Social Security Act. Plaintiff filed a motion for summary judgment and defendant moved for an order affirming the decision of the Commissioner. After consideration of the motions filed by plaintiff and defendant, plaintiff's motion is granted in part and denied in part and defendant's motion is denied.

2. The administrative record filed by the Commis-

## BACKGROUND

Plaintiff was born on September 3, 1959. (*See* R. 164.)[2] She attended one year of college and received computer training at a vocational school. (*See* R. 47, 210.) She has worked as a clerk in the shoe department at Bradlees and a school bus driver. (*See* R. 47, 210.) As a clerk, plaintiff had to walk for three to five hours in an eight hour day, stand for three to five hours and constantly bend, reach and lift up to ten pounds. (*See* R. 211.) Plaintiff claims that she became disabled on November 1, 1989. (*See* R. 164.)

Plaintiff filed three applications for SSI benefits. The first application was filed on April 2, 1990 and denied on June 8, 1990. (*See* R. 92–104, 107–109.) The second application was filed on January 13, 1992 and denied on May 4, 1992. (*See* R. 118–40, 142–45.) Plaintiff did not seek reconsideration of the denial of the first two applications. Plaintiff filed the third application on November 9, 1993. (*See* R. 164–67.) The application was denied on January 27, 1994. (*See* R. 179–81.) In response to plaintiff's request for reconsideration filed on March 5, 1994, (*see* R. 182–83), the agency, on June 14, 1994, issued a notice of reconsideration upholding the denial of benefits. (*See* R. 200–03.) Plaintiff filed her request for a hearing before an ALJ on July 11, 1994. (*See* R. 204–05.)

The hearing before the ALJ was held on December 14, 1994. (*See* R. 43–91.) Plaintiff appeared with counsel at the hearing. (*See* R. 45.) She stated that she left her job as a school bus driver because her headaches prevented her from driving. (*See* R. 50.) She testified that in 1989 she was "fired" from her job as a clerk in the shoe department because she needed an operation and "[t]hey couldn't wait." (R. 48.) She has not worked since her operation. She has applied for other jobs but has not been hired. (*See Id.*) She has been depressed since the operation. (*See* R. 49.)

Plaintiff stated that she experiences seizures "very often," approximately four or five times per week. (*See* R. 53.) She also testified, however, that she has not suffered a

sioner shall be referred to as "R."

seizure for one month. (*See* R. 52.) She takes Dilantin to control the seizures. Plaintiff stated that her doctors are having difficulty controlling her Dilantin levels because she also suffers from colds, sinus infections, asthma and vomiting. (*See* R. 52–53.) When she experiences a seizure, plaintiff stated that her neck gets stiff and she feels "all shaky." (R. 54.) Sometimes she loses consciousness. The seizures may occur "one after another like they don't stop." (R. 55.) Plaintiff stated that she tries to control the seizures herself and seeks medical assistance if she is unsuccessful. (*See Id.*)

Plaintiff also described migraine headaches occurring every day for the previous two years. (*See* R. 57.) She stated that most medication is not effective and that the most recently prescribed medication provides relief for approximately two hours but makes her fall asleep. (*See* R. 57–58.) Plaintiff also stated that she suffers from frequent asthma attacks which prevent her from breathing. Although she takes medication and uses an inhaler, these measures rarely provide relief. (*See* R. 59.)

Plaintiff stated that she was in an automobile accident in May 1994. As a result of the accident, she cannot turn her neck, her arms feel numb, she experiences leg pain and she cannot sleep. (*See* R. 59–60.) She has been treated at the Yale–New Haven Hospital Center for Pain Management. (*See* R. 60.)

Plaintiff stated that she rarely leaves her house unless she has a medical appointment. (*See* R. 61.) She cared for her three children, aged seventeen, sixteen and thirteen at the time of the hearing. The eldest child is hearing impaired and suffers from brain damage and a seizure disorder. (*See Id.*) Plaintiff bathes her handicapped child. Her husband cooks, cleans and does the laundry. Plaintiff stated that sometimes she does these chores, but other times cannot get out of bed. (*See* R. 62.) If she takes her medication, plaintiff is able to clean the house or vacuum. (*See* R. 65.)

The ALJ also heard testimony from a medical expert and a vocational expert. (*See* R. 67–77, 78–88.) The medical expert stated that the medical evidence supports plaintiff's claims that she suffers from gynecological or pelvic problems, gout, intermittent seizure disorder, migraine headaches, post-accident cervical spasm and psychological problems. (*See* R. 67–69.) He stated that the focus of plaintiff's medical treatment has shifted away from the gynecological problems and gout. (*See* R. 70.) He indicated that the seizure disorder was the "strongest objective thing that we have." (*Id.*) He noted, however, that no seizures have ever been professionally witnessed. The medical expert stated that the seizure disorder diagnosis, which is based upon the plaintiff's history, was sufficiently convincing. The normal electroencephalograms neither supported nor ruled out the diagnosis. He noted that plaintiff's Dilantin levels are never where they should be and opined that plaintiff's vomiting may be inhibiting the absorption or that she may be noncompliant with the strict regimen for certain periods of time. (*See Id.*)

The medical expert stated that plaintiff had been prescribed antiasthmatic medication fairly consistently but he could not determine whether the medication provided any relief. (*See* R. 71.) The headaches described in the medical records were not characteristic migraine syndrome. (*See* R. 72.) The medical expert stated that plaintiff's seizure disorder came the closest to meeting or equaling a listed impairment, but the medical records did not contain an adequate description of the seizures. Information describing the symptoms and frequency of the seizures is based upon hearsay and largely subjective. (*See Id.*)

The medical expert noted that plaintiff's behavior is consistent with a depressive syndrome and mood disturbance. The only reference in the record is to an impression of depression. (*See* R. 73.)

The medical expert opined that, considering only plaintiff's physical impairments identified from the record, she could perform work at the light or moderate level. Plaintiff should work in a protective environment, avoiding heights as well as driving, operating or handling heavy machinery. (*See* R. 74–75.) He found no limitation on plaintiff's ability to stand or walk for six hours in an eight hour workday. The medical expert stated that plaintiff's asthma was "relatively mild, relatively controllable by the judicious

use of the medications" and determined that plaintiff exhibited "no significant residual pulmonary function impairment." (R. 75.) The medical expert opined that plaintiff's physical impairments did not meet or equal a listed impairment, but that if her psychological impairments were documented and included, the combined impairments would equal a listed impairment. (See Id.)

The ALJ heard testimony from a vocational expert concerning plaintiff's ability to perform substantial gainful activity. The first hypothetical limited an individual to light or medium level work with no driving, operating heavy machinery, working at heights or climbing. (See R. 82–83.) The vocational expert stated that such an individual could perform plaintiff's past work as a clerk in a shoe department. She could also perform bench assembly-type operations and non-machinery oriented jobs such as cage cashier, information clerk, parking lot cashier or guard monitor. (See R. 83–84.) In the second hypothetical, the ALJ included the fact that the individual had difficulty with concentration and attention because of medication. (See R. 84.) The vocational expert stated that the employability of such an individual depended upon the extent to which concentration and attention were affected. (See R. 85.) Plaintiff's asthma eliminated parking lot attendant or cashier jobs. Her attention and concentration problems eliminated all but light assembly jobs. (See R. 86.) The vocational expert noted that he would need more information about plaintiff's limitations to determine the viability of other jobs. He indicated that medical evidence of blackouts or regular headaches would have an adverse impact on employability. (See R. 87.)

At the close of the hearing, the ALJ ordered plaintiff to undergo a consultative psychiatric examination and requested updated medical records. (See R. 88.) Plaintiff's attorney requested that the consultative psychiatrist be fluent in Spanish. The ALJ noted, however, that plaintiff was born in Illinois and displayed no difficulty communicating in English at the hearing. (See Id.)

The ALJ had before him medical evidence for the period from November 1981 through July 1995. A summary of the relevant medical evidence follows.

In November 1981, plaintiff reported that she suffered from three to four severe headaches each week. She described the headaches and accompanying vomiting as incapacitating. Tylenol did not relieve the headache pain. (See R. 645.) Also in November 1981, plaintiff underwent the surgical removal of an ovarian cyst. (See R. 643.) In December 1985, she underwent surgery to remove her right ovary. (See R. 507.)

In December 1982, plaintiff reported to the Yale–New Haven Hospital emergency room after suffering a seizure or pseudo-seizure. (See R. 610.) A cervical spine and skull series was normal. (See R. 600.) In January 1983, an EEG and CT scan of plaintiff's head performed at Yale–New Haven Hospital were normal. (See R. 593, 597, 598.) Plaintiff was assessed as suffering from a possible seizure disorder, hyperventilation and common migraine headaches. (See R. 597.) On March 11, 1983, plaintiff was referred to the Veterans Administration Medical Center in West Haven, Connecticut, for evaluation of three "spells" and to determine whether she was experiencing seizures. (See R. 234, 595.) In her admission report, plaintiff stated that she experienced her first seizure in November 1982, with other seizures in February and March 1983. She believed that she experienced seizures when she was emotionally upset. (See R. 588, 591.)

Tests revealed no evidence of a seizure disorder. (See R. 236.) The impression was that plaintiff had "pronounced cognitive impairment in the areas of memory and capacity of new learning as defined by IQ." (R. 573.) Plaintiff had an IQ of 72. (See R. 236.) Her visual integrative skills were normal. (See R. 573.) "Personality-wise, she emotionally overreacts and thus either, a) her affective discharge and acting out behavior including pseudo-seizures remains a working diagnosis, consistent with this exam or b) given a low threshold for affect control, this may in fact act as an antecedent to frank epileptic seizures." (R. 574.) During the evaluation plaintiff experienced no seizure episodes and her EEG was normal. (See R. 236, 575.) The examining physician doubted that plaintiff had a seizure disorder. (See R. 576.)

March 1985 progress notes from the Yale–New Haven Hospital Neurology Clinic revealed that plaintiff sought treatment for convulsions brought on by nerves. Although plaintiff reported a seizure history in childhood, she told the treating sources that she had not experienced a seizure as an adult until one year earlier. (*See* R. 522.) She stated that she had experienced several seizures in the past year, most recently one month before the examination. None of the seizures had been medically documented. (*See Id.*)

In December 1988, plaintiff sought treatment at the Hospital of St. Raphael in New Haven, Connecticut, for pain in her right ankle and foot. (*See* R. 501, 504.) In January 1990, plaintiff sought treatment for gynecological problems. (*See* R. 241.) In April 1990, plaintiff reported to the emergency room at the Hospital of St. Raphael after being assaulted. She was treated for neck and back pain. (*See* R. 239.) In May 1990, plaintiff underwent a consultative examination. (*See* R. 244–45.) The consultative physician did not review any medical records. His assessment was simple a recitation of plaintiff's complaints of seizures, asthma, migraine headaches, gout and kidney stones. (*See* R. 245.)

In January 1990, plaintiff frequently began seeking treatment at the Hospital of St. Raphael. (*See* R. 299.) In February 1990, she was treated for recurring gout. (*See* R. 307.) In September 1990, plaintiff underwent pulmonary testing that suggested a minimal obstruction to air flow. (*See* R. 333.) In October 1990, plaintiff was treated for chronic pelvic pain. (*See* R. 246–52.) The discharge summary identified additional diagnoses as seizures, asthma, syncope,[3] history of gout and described plaintiff as status post laparoscopy total abdominal hysterectomy and left salpingo-oophorectomy.[4] (*See* R. 246.)

From March 1990 through March 1993, plaintiff sought treatment for seizures at the Hospital of St. Raphael. In March 1990, she reported that she had stopped taking her anti-seizure medication and had experienced eight seizures in the past year. Each seizure was accompanied by an aura and, according to the observations of others, grand mal-type symptoms. (*See* R. 308.) A March 21, 1990 EEG showed dysrhythmic activity consistent with seizure. (*See Id.*) Plaintiff's migraines appeared stable and she was started on Dilantin for seizures. (*See* R. 309.) In April 1990, plaintiff failed to report to the hospital to have her Dilantin level checked. In July 1990, she reported no further seizure activity. She also stated that Motrin relieved her headaches. In August 1990, plaintiff reported that she had experienced a seizure at home. She went to the emergency room but was not admitted to the hospital. Plaintiff's Dilantin dosage was increased. (*See* R. 313.) In September 1990, plaintiff's Dilantin level tested low. (*See* R. 319.) An EEG performed that month, however, was normal. (*See* R. 332, 491.) She did not keep her October appointment to have the Dilantin level checked. (*See* R. 320.)

In November 1990, the treating source noted that plaintiff experienced recurrent seizures and was having difficulty achieving a therapeutic level of Dilantin. Physicians again tried to establish a therapeutic Dilantin level. (*See* R. 320–21.) The source also noted that plaintiff's asthma was stable and she obtained relief from her migraine headaches with Motrin. (*See* R. 321.) In February, April, June and July 1991, plaintiff failed to attend scheduled appointments. (*See* R. 338, 356.)

From March 1991 through November 1993, plaintiff was treated by the General Practitioners of Hamden in Hamden, Connecticut. (*See* R. 265–79.) Progress notes indicate that plaintiff presented with complaints of pain in her right knee, lower back, both flanks, chest, shoulder and left ankle. In September 1991, plaintiff sought treatment for headaches lasting four days and seven days. The possible diagnosis was sinus headache. (*See* R. 274.) In February 1992, plaintiff reported that she had experienced a chronic headache lasting two months. (*See* R. 275.) Pulmonary testing performed

---

**3.** The loss of consciousness and postural tone caused by diminished cerebral blood flow. Stedman's Medical Dictionary 1720 (26th ed.1995).

**4.** The surgical removal of the ovary and fallopian tube. Stedman's Medical Dictionary 1567.

in April 1992 suggested a mild to moderate obstruction to her airflow.

In February 1992, plaintiff again sought treatment at the Hospital of St. Raphael for complaints of migraine headaches and abdominal pain. The impression was headache pain caused by migraine headaches or sinusitis. (*See* R. 338–39.) March 1992 notes indicate that the sinusitis had resolved and the impression was revised to tension headaches. Plaintiff also had a subtherapeutic level of Dilantin. (*See* R. 340.) Plaintiff again failed to keep appointments in April and May 1992. (*See* R. 341.)

In April 1992, plaintiff underwent a consultative examination. (*See* R. 263–64.) The consultative physician noted that he had reviewed "no impressive objective findings" and based his assessment on plaintiff's history. (R. 264.) He determined that plaintiff suffered from convulsive seizures or epilepsy, chronic asthma, migraine headaches and recurrent urinary tract infections. (*See Id.*)

In May 1992, plaintiff underwent a cystoscopy for recurrent urinary tract infections. (*See* R. 346–47.) X-rays of plaintiff's knees and ankles, taken the same month, revealed no abnormalities in the bone, joint or soft tissue. There was no evidence of arthritis. (*See* R. 344.)

In November 1992, plaintiff sought treatment for what is described as her sixth bout of chest pain in four years. Chest x-rays were within normal limits and an EKG was normal. Although plaintiff reported that she had stopped taking her Dilantin, she had not experienced a seizure for one month. (*See* R. 351.) Plaintiff was directed to resume taking her Dilantin and to stop smoking. (*See* R. 353.)

In January 1993, she reported a headache lasting three weeks; in February 1993, she was referred to a neurologist when she complained of suffering migraine headaches every day for two months. (*See* R. 276.) In March 1993, plaintiff reported that she had experienced four or five seizures since November, two within the last week. She said that she had run out of Dilantin in December 1992. (*See* R. 354.) In April 1993, plaintiff was diagnosed as suffering from chronic sinusitis. (*See* R. 361.)

From April through December 1993, plaintiff was treated at the Neurology Clinic at Yale–New Haven Hospital. (*See* R. 280–98.) Plaintiff complained of severe headaches and experiencing eight seizures per month. Treating sources noted that plaintiff's headaches were probably caused by tension and suspected low Dilantin levels as the cause of her seizures. (*See* R. 497.) An EEG performed in April 1993 was normal for an adult who was awake and asleep. No focal, lateralized or epileptiform abnormalities were observed. (*See* R. 491–93.) An MRI brain scan performed in April 1993 to determine the source of plaintiff's headaches was negative. (*See* R. 282–83, 492.) In May 1993, when plaintiff reported that her headaches and seizure were unchanged, her prescribed dose of Dilantin was increased to achieve a therapeutic level. (*See* R. 284–85, 489–90.)

In August 1993, plaintiff sought treatment at CHCP, a health maintenance organization in New Haven, Connecticut. Plaintiff reported experiencing a seizure three weeks earlier and one a month before that. She claimed to have taken her Dilantin faithfully for two months. (*See* R. 369–70.) In October 1993, plaintiff complained of an upset stomach and stated that she had not taken her Dilantin for one week. (*See* R. 373.)

In October 1993, plaintiff was given nerve block injections at the Yale–New Haven Hospital Center for Pain Management to relieve the pain in her right lower leg. (*See* R. 286–93.)

On February 17, 1994, plaintiff reported experiencing a seizure the day before. She claimed to have been taking her Dilantin regularly since December, but had been experienced vomiting. (*See* R. 376.) In March 1994, plaintiff was referred to Thomas Byrne, M.D., for treatment of her seizures. The physician noted that an EEG taken a year earlier was negative and that the seizures were well-controlled on Dilantin. (*See* R. 378.) Also in March 1994, plaintiff's treating physician stated that her claim that she had vomited everything that she had eaten in the past month was not true. (*See* R. 379.) Plaintiff again complained that vomiting caused her Dilantin level to be subtherapeutic in April 1994. (*See* R. 380.)

In March 1994, plaintiff's treating psychologist, Len Guitar, reported that he had seen plaintiff for depression on four occasions from December 1993 through January 1994. (*See* R. 394.)

In March 1994, plaintiff's treating psychiatrist, John Krystal, reported that he had seen plaintiff twice, in February and March 1994. He stated that plaintiff had significant difficulty managing the current stress in her life and diagnosed plaintiff as suffering from an adjustment disorder with mixed anxious and depressive features, major depression and an organic affective disorder. (*See* R. 393.) In April 1994, Dr. Krystal completed a questionnaire regarding her psychiatric impairment. (*See* R. 231–33.) He noted that plaintiff's history of depression began three months earlier, but that she had a long history of seizure disorder dating to her childhood and experienced intermittent seizures. (*See* R. 232.) He described her appearance as moderately disheveled, her speech as well organized and her mood as anxious and depressed. Her judgment and memory were intact and her ability to concentrate was good. She experienced no hallucinations or delusions. (*See* R. 231.) He opined that plaintiff could function alone. She was very busy with child care responsibilities and had gone on job interviews. Although her family reported that plaintiff was increasingly irritable, plaintiff interacted well during the interview with her treating psychiatrist. Plaintiff displayed a low frustration tolerance, but persisted in her household duties. The treating psychiatrist noted that plaintiff reported getting angry easily with family members and walking out of job interviews. (*See* R. 232.) The treating psychiatrist recommended that plaintiff be sent to interview technique training. (*See* R. 233.)

In May 1994, plaintiff was involved in an automobile accident. In June 1994, plaintiff sought treatment for left knee pain. Her primary care physician doubted any "significant pathology" and noted that any injury was "very difficult to assess in this histrionic patient." (R. 446.) An MRI of plaintiff's knee was normal. (*See* R. 448.) In a June 1994 letter to plaintiff's treating chiropractor, an examining physician reported that she experienced radiating neck pain as a result of the accident. The examining physician opined that plaintiff had suffered cervical sprain rather than disc herniation. (*See* R. 404–05.) A cervical CT scan was normal as were electrodiagnostic studies on plaintiff's left arm and hand. (*See* R. 406–07.) Plaintiff also underwent a second nerve block injection at the Center for Pain Management. (*See* R. 471.)

In June 1994, plaintiff's treating chiropractor reported on plaintiff's injuries from the automobile accident. (*See* R. 474–75.) He opined that plaintiff suffered from acute cervical strain on the left, left cervical-brachial syndrome with left arm myofascitis and right knee pathology. (*See* R. 475.)

Plaintiff underwent physical therapy at the Gaylord/Yale–New Haven Rehabilitation Center at Long Wharf in New Haven, Connecticut, from July through November 1994. Plaintiff was late for or missed many appointments and obtained no relief for her cervical pain. (*See* R. 436, 459.) In July 1994, however, plaintiff's primary care physician at CHCP reported that "[d]espite her protestations to the contrary she is clearly better with increased neck mobility." (*See* R. 441.)

In September 1994, plaintiff's physician discontinued her Prozac prescription because of vomiting. He noted that plaintiff had become more excitable and irritable. (*See* R. 439.) From October through December 1994, plaintiff sought treatment at CHCP for headaches, nasal pain and nausea. In November, she complained that she had been vomiting for two days. (*See* R. 433–35.) She also complained that she had experienced an intense headache for three days and stated that she had obtained headache relief from an injection received at Yale–New Haven Hospital. (*See* R. 463.)

From January through April 1995, plaintiff sought treatment on several occasions for sinusitis. (*See* R. 786, 791, 797, 800–05, 811.) In May 1995, plaintiff underwent surgery to correct the sinus condition. (*See* R. 829.)

In March 1995, plaintiff underwent the consultative psychiatric examination ordered by the ALJ. Plaintiff told the consultative psychiatrist that she was terminated from her job because she experienced so many

seizures. Plaintiff reported that she experienced seizures almost daily. She had a seizure every day the previous summer but had not experienced one for the past month. She stated that she has experienced migraine headaches daily for nineteen years, often accompanied by nausea and vomiting. She has had a chronic sinus problem for six or seven years. (*See* R. 777.) Plaintiff reported that she has been treated for depression and anxiety on a weekly basis for the past year. (*See* R. 778.) She described her daily activities as caring for her personal needs and doing minimal cooking and light chores. She draws, crochets and spends most of her time in bed. (*See* R. 779.) The consultative psychiatrist described plaintiff as moderately anxious and moderately agitated. Her mood was depressed. She demonstrated memory and attention span within normal limits, poor insight and fair to poor judgment. He diagnosed plaintiff as suffering from moderate depression with moderate anxiety and seizures. (*See* R. 780.)

In April 1995, neurological consultant Thomas Byrne, M.D., reported an unremarkable neurological examination. He noted no evidence of increased intracranial pressure and stated that seizures were not a problem when plaintiff took her anticonvulsant medication. (*See* R. 792.)

In addition to the medical evidence, the ALJ had reports and questionnaires completed by plaintiff. In the disability report completed in November 1993, plaintiff stated that her physician told her not to walk "too much" and to stop smoking. She reported both that she did not sleep and that her medications made her drowsy. (*See* R. 206, 209.) During each day, plaintiff read, watched television, cleaned a little and sat. She no longer drove because she was involved in an automobile accident. Sometimes her friends visited her. (*See* R. 209.)

In November 1993, plaintiff also completed an activities questionnaire. (*See* R. 222–25.) Plaintiff stated that she cared for her handicapped daughter. She shared the cooking responsibilities with her husband but standing and heights bothered her while cooking. (*See* R. 222.) Her husband did the grocery shopping and he and the children did most of the household chores. Sometimes, plaintiff washed dishes. (*See* 22–23.) Plaintiff spent her time doing needlework, sewing, reading, watching television, listening to the radio and drawing. Dancing and walking caused her legs and back to hurt. (*See* R. 224.)

In a pain questionnaire completed at the same time, plaintiff described constant pain occurring almost every day in her ankles, head and between her eyes. (*See* R. 227.) She stated that the pain, brought on by walking and standing, usually lasted for two to three days and sometimes lasted a week. (*See Id.*) Her daily medication provided relief for only 1½ hours and sometimes caused her to feel dizzy. (*See* R. 227–28.) In a November 1993 seizure questionnaire, plaintiff reported experiencing between five and six seizures each month. Each seizure lasted up to three minutes and sometimes caused her to lose consciousness. (*See* R. 229.)

In the reconsideration disability report completed in February 1994, plaintiff stated that she was always in pain. (*See* R. 214.) She reported that at times she could not move her leg and required assistance caring for her personal needs. She could not shop for groceries or vacuum. (*See* R. 216.) In her statement filed when she requested a hearing, plaintiff stated that her condition has worsened since her automobile accident. Her seizures became more frequent and prevented her from going out alone. She experienced migraine headaches daily and her depression became more severe. Her circulatory problems have worsened and ambulation was more difficult. (*See* R. 220.)

The agency also assessed plaintiff's physical and mental residual functional capacity. In January 1994, at the time of her application, plaintiff's primary diagnosis was epilepsy and her secondary diagnosis was asthma. (*See* R. 168.) A physical residual functional capacity assessment revealed that plaintiff could lift fifty pounds occasionally and twenty-five pounds frequently. She could sit or stand for six hours in an eight hour workday and had an unlimited ability to push or pull. (*See* R. 171.) Plaintiff was restricted to climbing only occasionally and never on a ladder. (*See* R. 172.) She should avoid concentrated exposure to fumes, dust, odors, gases and poor ventilation, and avoid all exposure to hazards such as heights and ma-

chinery. (See R. 174.) The examiner noted that plaintiff had multiple somatic complaints, a history of seizure disorder with occasional attacks and a history of bronchial asthma that was controlled by medication. (See R. 175.) As a result of this assessment, the agency determined that plaintiff could perform work at the medium level of exertion with restrictions for climbing ladders and exposure to fumes. Thus, she could return to her past job as a stock clerk. (See R. 178.)

At the time of plaintiff's request for reconsideration, her primary diagnosis was epilepsy and asthma and her secondary diagnosis was affective disorders and depression. (See R. 184.) A psychological review technique form completed at this time noted that plaintiff displayed slight restrictions of activities of daily living and slight difficulties maintaining social functioning. She often exhibited deficiencies of concentration, persistence or pace resulting in failure to complete tasks timely and never demonstrated episodes of deterioration or decompensation in work or work-like settings. (See R. 192.)

A mental residual functional capacity assessment indicated that plaintiff's abilities to understand and remember detailed instructions, to carry out detailed instructions and to maintain attention and concentration for extended periods were moderately limited. (See R. 194.) Plaintiff's social interactions, ability to adapt and all other categories were not significantly limited. (See R. 194–95.) The examiner relied on a statement in one of plaintiff's previous applications that her job as a clerk required her to lift 100 pounds [5] in concluding that she could not return to that job. He noted, however, that plaintiff could perform jobs such as a fast food worker, packager or office helper. (See R. 198–99.)

On August 14, 1995, the ALJ denied plaintiff's application for SSI benefits. (See R. 16–33.) On October 11, 1995, plaintiff filed a request for review by the Appeals Council. (See R. 14–15.) Plaintiff submitted additional medical evidence to the Appeals Council which was made part of the record. (See R. 7.) A summary of the additional medical evidence follows.

In June and July 1995, plaintiff sought treatment for headaches. (See R. 896, 897, 899.) She reported that sinus surgery had not relieved her headaches. (See R. 896.) On August 10, 1995, plaintiff was transported to the Milford Hospital in Milford, Connecticut, after experiencing what co-workers described as seizure activity. (See R. 865, 882.) The treating source indicated that plaintiff had suffered a grand mal seizure lasting five minutes. Plaintiff indicated that she had not taken her Dilantin because her stomach was upset. (See R. 862–63, 879–80.) On August 11, 1995, plaintiff experienced another seizure when she failed to take her medication because of nausea. (See R. 895.) In December 1995, plaintiff sought treatment for recurrent lower leg pain. (See R. 893–94.)

In May 1996, plaintiff was seen on three occasions concerning seizures. (See R. 877, 888, 892.) The treating physician noted that plaintiff is never compliant with Dilantin; her tests always indicate subtherapeutic levels. (See R. 888.) In October 1995, the plaintiff sought treatment for headaches and seizures. She stated that after experiencing emotional upset she suffered headaches and seizures for four days. (See R. 892.)

On April 19.1996, Edward Prior, plaintiff's treating physician reported that plaintiff suffers from seizures since birth, asthma, chronic ankle pain, migraine headaches, depression, anxiety and chronic sinus problems. He opined that plaintiff was "quite disabled by these problems." (R. 953.) The treating physician stated that plaintiff's current medications included Dilantin, Paxil, Ibuprofin and Initrix. He indicated that she was compliant with all her medications. He also noted that he did not expect her work capacity to improve. (See R. 954.) Although the treating physician was asked to complete mental and physical residual capacity assessments, he did not complete this portion of the report. (See R. 955–57.)

In a September 6, 1996 letter, plaintiff's treating physician stated that plaintiff was currently unable to work but her condition was not permanent. He noted that plaintiff was consulting a gastroenterologist for her

---

5. In her current application, plaintiff revised her description of her former job duties and stated that she was required to lift only ten pounds. (See R. 211.)

stomach problems. He noted that plaintiff's seizure disorder was

> poorly controlled due to difficulty with oral medications secondary to ... vomiting. As a result of this, her Dilantin is irregularly absorbed and her level of Dilantin in her blood rises and falls in an irregular manner. When it is low, she is quite prone to seizures. It has been very difficult to control.

(R. 965.) He opined that plaintiff was currently unable to work. (*See Id.*)

Also in September 1996, plaintiff's treating psychologist prepared a mental residual functional capacity assessment. He stated that he had treated plaintiff on six occasions. He found that plaintiff was not significantly limited in her activities of daily living, ability to remember and carry out simple instructions, ability to maintain attention and concentration, ability to make simple decisions, ability to interact appropriately with others, ability to work at a consistent pace and ability to respond appropriately to changes. (*See* R. 970–72.)

On April 3, 1997, after considering the additional evidence, the Appeals Council denied the request for review. (*See* R. 5–6.)

> The Administrative Law Judge's conclusion that you remain capable of light work, including certain of your past jobs, is based on the observations and assessments of your treating physicians, the general lack of medical diagnoses, the findings of consultative examiners, and normal results on many of the laboratory tests. He did not rely solely on the absence of clinical abnormalities, nor did he err by including such evidence in his deliberations, as your attorney contended.
>
> Until the final step in the sequential evaluation process is reached, the burden is on the claimant to establish medically determinable impairments of such severity as to prevent the person from performing at least their past relevant work. The Administrative Law Judge found that you established impairments which significantly affect your ability to perform work-related activities, but only to the extent that more than a specified range of light work is precluded. The Council decided that his action, findings, and conclusions remain supported by the weight of the

evidence now of record, and that no basis exists for changing his decision.

> The Appeals Council acknowledges your request for reopening and revision of the final determinations made in connection with your prior applications. However, the Administrative Law Judge addressed this issue, denying your request. The Appeals Council found his action to be supported by the record.

(*Id.*) Plaintiff then timely filed this appeal within the sixty day period following receipt of the decision of the Appeals Council.

## STANDARD OF REVIEW

■ The scope of review of a social security disability determination involves two levels of inquiry. The court must first decide whether the Commissioner applied the correct legal principles in making the determination. Next, the court must decide whether the determination is supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir.1987). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Rodriguez v. Califano*, 431 F.Supp. 421, 423 (S.D.N.Y.1977). The court may not decide facts, reweigh evidence or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir.1993); *Reyes v. Harris*, 486 F.Supp. 1063, 1067 (S.D.N.Y.1980). The court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. Furthermore, "[w]hen there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." *Johnson v. Bowen*, 817 F.2d at 986.

■ Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. 42 U.S.C.

§ 423(a)(1). "Disability" is defined under both programs as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process. *See* 20 C.F.R. § 416.920. First, the court must determine whether the claimant is currently working. *See* 20 C.F.R. §§ 416.910(b), 416.972(b). If the claimant is currently employed, the claim is disallowed. *See* 20 C.F.R. § 416.920(b). If the claimant is not working, as a second step, the agency must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is denied. *See* 20 C.F.R. § 416.920(c). Once the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in appendix 1 of the regulations [the "Listings"]. *See* 20 C.F.R. § 416.920(d); *Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 416.920(d); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982). If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 416.920(e). If the claimant cannot perform his former work, he must show, as a fifth and final step, that he is prevented from doing any other work. A claimant is entitled to receive disability benefits only if he cannot perform any alternate gainful employment. *See* 20 C.F.R. § 416.920(f).

■ The initial burden of establishing disability is on the claimant. *See* 42 U.S.C. § 423(d)(5). Once the claimant demonstrates that he is incapable of performing his past work, however, the burden shifts to the Commissioner to show that the claimant has the residual functional capacity to perform other substantial gainful activity in the national economy. *See Parker v. Harris*, 626 F.2d 225, 231 (2d Cir.1980). This may require the application of the Medical–Vocational Guidelines ["the grid"] which places claimants with severe exertional impairments who can no longer perform past work into grid categories according to their residual functional capacity, age, education and work experience, and dictates a conclusion of disabled or not disabled. *See* 20 C.F.R. § 404.1520(f). A proper application of the grid makes vocational testing unnecessary.

■ The grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders are not covered. *See* 20 C.F.R. § 200.00(e)(2). If the grid cannot be used, *i.e.*, when nonexertional impairments are present or when exertional impairments do not fit squarely within grid categories, the testimony of a vocational expert is generally required to support a finding of residual functional capacity for substantial gainful activity. *See Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir.1986).

## DISCUSSION

As an initial matter, the ALJ denied plaintiff's request to reopen the two previous applications for SSI benefits. He cited his denial of the current application and the absence of new and material evidence as support for his finding that plaintiff failed to demonstrate good cause to warrant reopening the prior applications. (*See* R. 19.)

Following the five step evaluation process, the ALJ determined that plaintiff has not engaged in substantial gainful activity since December 1, 1989. (*See* R. 27.) Although plaintiff presented medical evidence that she suffers from "a seizure disorder, asthma, cervical sprain status post a motor vehicle accident, headaches, an adjustment disorder with depressed features, and chronic right leg pain," the ALJ found that her impairment does not meet or equal any listed impairment. (*See* R. 28.) The ALJ found plaintiff's "subjective allegations of debilitating pain and functional limitation are not fully credible in light of her contradictory statements and the minimal objective medical findings." (*Id.*) The ALJ determined that plaintiff had the residual functional capacity to perform work at the light level of exertion. (*See Id.*) The ALJ found that plaintiff's non-

exertional limitations including "avoidance of concentrated exposure to dust, fumes, and temperature extremes; heights; dangerous machines; driving; and frequent climbing" and her mental restriction to routine and repetitive tasks did not prevent plaintiff from performing her past work as a clerk in a shoe department. (*Id.*) In the alternative, the ALJ found that plaintiff could be expected to make a vocational adjustment to work existing in significant numbers in the national economy, such as bench assembly and cage cashier, excluding parking lot attendant, jobs. (*See Id.*) Thus, the ALJ found that plaintiff has not been under a disability at any time through the date of decision and denied SSI benefits. (*See* R. 29.)

The ALJ also completed a psychiatric review technique form. (*See* R. 30–33.) He noted that plaintiff presented evidence of affective disorders, Listing 12.04, and anxiety disorders, Listing 12.06. (*See* R. 31, 32.) He determined, however, that plaintiff demonstrated only slight restrictions of activities of daily living and moderate difficulties maintaining social functioning. She seldom exhibited deficiencies of concentration, persistence or pace resulting in failure to complete tasks timely and never demonstrated episodes of deterioration or decompensation in work or work-like settings which caused her to withdraw from the situation or experience exacerbation of signs or symptoms. (*See* R. 32.) He also noted the absence of factors demonstrating an inability to function independently outside the home. (*See* R. 33.)

Plaintiff advances two arguments in support of her motion for summary judgment: (1) the ALJ failed to make express credibility findings regarding her subjective complaints of pain, and (2) the ALJ failed to properly apply the treating physician rule and did not afford proper weight to her symptoms. In response, defendant argues that the ALJ's decision is supported by substantial evidence. Defendant also notes that plaintiff does not challenge the ALJ's determination that she retained an unlimited ability to sit, stand and walk. The court considers these arguments below.

## I. *Credibility Determination*

Plaintiff first contends that the ALJ ignored her subjective complaints of pain and failed to make any express credibility finding. In response, the defendant argues that the ALJ made a proper credibility finding.

▮▮▮▮ The function of the Commissioner includes evaluating the credibility of all witnesses, including the plaintiff. *See Carroll v. Secretary of HHS*, 705 F.2d 638, 642 (2d Cir.1983). Although the Commissioner is free to accept or reject the testimony of any witness, a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir.1988) (citing *Carroll*, 705 F.2d at 643). The ALJ's findings must be consistent with the other evidence in the case. *Id.* at 261. After reviewing the ALJ's decision, the court concludes that the ALJ's credibility finding, that plaintiff's subjective complaints were not fully credible, is set forth with sufficient specificity.

## II. *Subjective Complaints of Pain*

Plaintiff next contends that the ALJ failed to properly credit the effects of her impairments because the record does not specifically identify the causes of those effects.

▮▮▮▮ In evaluating subjective symptoms such as pain, a claimant must first demonstrate the existence of a medically determinable impairment that could reasonably be expected to produce the symptom. After such an impairment has been identified, the intensity and persistence of the claimant's pain are evaluated based on all available evidence. The claimed pain will not be rejected simply because the objective medical evidence does not support the claim. Other factors which will be considered include the claimant's medical history, diagnosis, daily activities, prescribed treatments, efforts to work and any functional limitations or restrictions caused by the pain. *See* 20 C.F.R. § 404.1529. In addition,

in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other

symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work. . . .

Social Security Ruling ("SSR") 95–5p,[6] 1995 WL 670415 (S.S.A.).

A review of the ALJ's decision indicates that he rejected plaintiff's subjective complaints as not fully credible. He pointed out many inconsistencies among plaintiff's testimony at the hearing, her statements to treating and consultative physicians and reports she filed with the agency. He noted the absence in the record of any medical cause for plaintiff's seizures, despite her treatment for seizures over a twelve year period. The ALJ relied on the fact that no medical source had restricted plaintiff's ability to sit, stand or walk for six hours in an eight hour workday or to lift up to ten pounds in rejecting plaintiff's claim that her impairments prevented her from returning to her previous job.

Although the ALJ may have adequately considered plaintiff's subjective complaints under the predecessor to SSR 95–5p, he failed to satisfy the requirements of SSR 95–5p because he did not include his personal observations. Because the court has determined, as discussed below, that the matter should be remanded for further proceedings, the ALJ is directed to incorporate his personal observations of plaintiff from the December 1994 hearing into his evaluation of her subjective complaints of pain.

### III. *Treating Physician Rule*

Plaintiff also contends that the ALJ failed to credit the treating physician's determination that she is "quite disabled."

The Commissioner has promulgated regulations regarding the evaluation of treating physicians' opinions which the district court is bound to apply. *See Schisler v. Sullivan,* 3 F.3d 563 (2d Cir.1993). The regulations require that more weight be given to opinions from treating sources because those sources are more likely to have detailed knowledge and understanding of the medical impairment. *See* 20 C.F.R. § 404.1527(d)(2). If the opinion of the treating source regarding the nature and severity of the claimant's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" contained in the record, the opinion will be given controlling weight. *Id.* " '[T]he opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient.' " *Arnone v. Bowen,* 882 F.2d 34, 41 (2d Cir.1989) (quoting *Mongeur v. Heckler,* 722 F.2d 1033, 1039 n. 2 (2d Cir.1983)).

When the treating source's opinion is not given controlling weight, the Commissioner applies various factors to determine what weight the opinion should receive. *See Id.* These factors include: whether the source actually examined the claimant; the length of the treatment relationship and the frequency of examinations; the nature and extent of the treatment provided by the treating source including the kinds of examinations and tests performed or ordered by the treating source; the extent to which the opinion is supported by relevant medical evidence such as medical signs or laboratory findings; whether the opinion is consistent with the record as a whole; and whether the treating source is giving an opinion in his area of specialty. *See* 20 C.F.R. § 404.1527(d)(1) through (5).

When the court reviews the record to determine whether the Commissioner's position is supported by substantial evidence, the court reviews the record as a whole. Rather than considering an item of evidence in isolation, the court assesses the evidence in light of other evidence that might detract from it. *See Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990). Where the record contains substantial evidence to support two

---

6. Although SSR 95–5p was not published until October 31, 1995, after the ALJ issued his decision in this case, it does not concern a newly created policy. SSR 95–5p replaces the section of SSR 88–13 and SSR 90–1p which is entitled "Importance of Considering Allegations of Pain in Assessing RFC and Explaining Conclusions Reached." *See* SSR 95–5p.

positions, the ALJ, as fact finder, is charged with choosing between them. *See Id.* In addition, it is within the province of the Commissioner, not that of the treating physician, to make the legal determination that a plaintiff is disabled. *See King v. Heckler,* 742 F.2d 968, 972 (6th Cir.1984). Thus, the ALJ is not bound by a conclusory statement from a treating physician that a claimant is totally disabled. *See Id.*

In this case, plaintiff contends that the ALJ failed to credit statements by her treating physician that she is "quite disabled." As noted above, the ALJ is not required to credit a treating physician's conclusion regarding disability. The treating physician also identified, however, the reason why plaintiff is unable to maintain a therapeutic level of Dilantin. This statement was included in the record after the ALJ had issued his decision denying benefits. Thus, the ALJ was unable to consider the impact of this opinion on his conclusion that plaintiff's seizures are controlled by her medication. The court cannot determine what weight should be afforded the treating physician's opinion. Thus, the case must be remanded to enable the Commissioner to reevaluate his decision in light of the additional medical evidence.

IV. *Substantial Evidence in Support of ALJ's Decision*

Defendant contends that the ALJ's decision is supported by substantial evidence. He notes that plaintiff does not challenge his finding that she can sit and stand for six hours in an eight hour day and can lift up to ten pounds frequently. Defendant also emphasizes the notations in the medical record that plaintiff's seizures are controlled by Dilantin and credit the ALJ's assumption that plaintiff voluntarily caused her Dilantin levels to be subtherapeutic. The repeated complaints of vomiting contained in the record and the treating physician's 1996 opinion that plaintiff's gastrointestinal problems caused her to absorb Dilantin irregularly contradict the ALJ's determination.

In addition, the medical expert testified that if plaintiff's psychological impairments were documented, she might be disabled. Although there is no medical evidence suggesting that plaintiff's mental impairments meet the listing requirements, the existence of depression and anxiety are documented in the reports of the treating psychiatrist, treating psychologist and consultative psychiatrist. It does not appear that the Commissioner has properly considered these opinions in connection with his evaluation of plaintiff's physical impairments and his decisions at the hearing and Appeals Council levels do not indicate his reason for failing to do so. Upon remand, the Commissioner is directed to assess the combined effect of plaintiff's exertional and nonexertional physical impairments and her mental impairments.

### CONCLUSION

For the reasons stated above, defendant's Motion for Order Affirming the Decision of the Commissioner [Doc. # 13] is DENIED. Plaintiff's Motion for Summary Judgment [Doc. # 7] is GRANTED in part and DENIED in part. The motion is granted to the extent that the decision of the Commissioner is reversed and the case is remanded for further administrative proceedings consistent with this decision. Plaintiff's motion is denied in all other respects.

This is not a recommended ruling. The parties consented to proceed before a United States Magistrate Judge [Doc. # 12] on October 27, 1997, with appeal to the Court of Appeals.

SO ORDERED.