**Randy MICHAELS, Plaintiff,**

v.

**Kenneth S. APFEL,[1] Commissioner of Social Security, Defendant.**

**No. 3:97CV421 (GLG).**

United States District Court,
D. Connecticut.

March. 29, 1999.

---

4.  Due to the consolidation of the two actions, defendants' motion has been assigned multiple docket numbers in error.

1.  On September 29, 1997, Kenneth S. Apfel was sworn in as the Commissioner of Social Security. Pursuant to Rule 25(d)(1), Fed. R.Civ.P., he is automatically substituted as the named defendant in this action.

Meryl Anne Spat, Waterbury, CT, for Plaintiff.

Deirdre Anne Martini, U.S. Attorney's Office, Bridgeport, CT, for Defendant.

## OPINION

GOETTEL, District Judge.

Plaintiff, Randy Michaels, filed this action against Defendant, the Commissioner of Social Security, seeking review, pursuant to 42 U.S.C. § 405(g), of the Commissioner's final decision denying his claim for disability insurance benefits and supplemental security income under the Social Security Act. Plaintiff claims that, because of disabling pain and functional limitations resulting from burns over 70% of his body, he is entitled to disability benefits. Plaintiff has moved for summary judgment [Doc. # 8] seeking an order reversing the

decision of the Commissioner, and Defendant has moved for an order affirming the decision of the Commissioner [Doc. # 11]. Upon consideration of the motions filed by Plaintiff and Defendant, this Court finds substantial evidence in the record to support the decision of the Commissioner. Plaintiff's Motion for Summary Judgment will be DENIED and Defendant's Motion to Affirm the Decision of the Commissioner will be GRANTED.

## BACKGROUND

### The Administrative Proceedings

On April 28, 1994, Plaintiff filed an application for a period of disability and disability benefits under Title II and Title XVIII of the Social Security Act, (R. 98–101), which was denied on July 19, 1994.[2] (R. 102–15). On July 28, 1994, Plaintiff filed a request for reconsideration. (R. 116–18). On September 23, 1994, the Social Security Administration issued its notice of reconsideration upholding the denial of benefits.[3] (R. 120–23). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ"), (R. 124–27), which was held on September 26, 1995. (See Transcript of Hearing, R. 36–97). On August 21, 1996, the ALJ denied Plaintiff's application for disability benefits. (See R. 12–20). The ALJ determined that Plaintiff was not entitled to a period of disability or disability insurance benefits ("DIB") under 42 U.S.C. §§ 416(i) and 423, and was ineligible for supplemental security income ("SSI") under 42 U.S.C. § 1381a, based upon his ability to perform a range of sedentary work in accordance with Rule 201.26, Table No. 1, Appendix 2, Subpart P, Pt. 404 of the Regulations.[4]

---

2. The Notice of Disapproved Claim, dated July 19, 1994, stated in part:

We realize that your condition prevents you from doing your past job, but it does not prevent you from doing other work. Your overall condition does not meet the basic definition of disability as defined by Social Security.
(R. 111).

3. The Notice of Reconsideration from the Social Security Administration stated that the decision to deny Plaintiff. disability benefits was based upon his ability to do sedentary work other than his past relevant work. (R. 120).

4. See Note 18, infra.

(R. 19). On August 29, 1996, Plaintiff filed a request for review by the Appeals Council, (R. 8–11), which was denied on February 5, 1997, (R. 6–7), thus rendering the ALJ's decision the final decision of the Commissioner and subject to judicial review. Plaintiff then timely filed this appeal.

### The Evidence before the Administrative Law Judge

At the administrative hearing on September 26, 1995, Plaintiff, who was represented by counsel, testified, as did his wife, a Medical Expert ("ME"), and a Vocational Expert ("VE"). The following is a summary of the evidence presented.

Plaintiff was born on October 3, 1959. (R. 42). He has a tenth grade education. (R. 53). When Plaintiff was three months old, he sustained burns over 70% of his body as a result of a fire caused by an electric blanket. Eventually, all of the toes on his right foot were amputated and, on his left foot, only nonfunctional stubs of toes remain. (R. 68, 159).

Plaintiff has been unemployed since May 30, 1990. He indicated in his Disability Report prepared in April 1994, that he could no longer work because he could only spend a limited amount of time on his feet and only a limited amount of time sitting. He stated that, if he stood on his feet for long periods of time, his feet began to ache terribly, and the muscles in his legs cramped if he sat or stood for too long a period. (R. 136). He had previously held a variety of jobs, ranging in duration from three weeks to three years, which included work as an operations manager at a sports complex, as a general mechanic for various automotive shops, doing equipment maintenance, as a bus driver, cleaning cars, trucks, and busses, doing lawn maintenance, and as a barrel plater. (R. 43–46, 59–61, 140). Plaintiff testified that he would take any work that he could get, but that his employers usually let him go because he was a high risk and, thus, would affect their insurance coverage. (R. 44). He also testified that he was dis-charged from one job because he could not stand all day. His last job, which he held for three years, was at a sports complex, where he waited on customers, attended the machines, and worked the cash register. He was terminated when the sports complex closed. (R. 43–44, 46–47, 59, 216). Thereafter, he sought employment at a number of places, but claims that he was not hired because of his disability. (R. 47–48). The amount of standing and sitting required in each of these jobs varied considerably. (R. 44, 59). He testified that, about three years before he applied for disability benefits, he became unable to perform any job even if it had a sit-stand option because of the increasing pain and cramping he experienced in his arms and back. He stated that even when he eats, his tongue and throat and everything cramps. (R. 48).

Plaintiff testified concerning the pain and functional limitations caused by his burns. Due to the severity of his burns, as a child, Plaintiff underwent extensive skin grafting and amputations of the toes on both feet. (R. 70, 96, 174). His lower extremities were the most badly burned and have the most significant skin grafts. Plaintiff, however, also has scars on his arms, back and stomach where skin was removed for grafting to his legs and feet. Plaintiff testified that the scar tissue periodically breaks open and has required treatment at the hospital because of infection. (R. 70, 96, 136–37).

He testified that he experiences constant pain in his legs, in varying degrees, ranging on a one-to-ten scale from a "four"—when the pain is not really bothering him—to a "twenty"—when the pain is severe. (R. 51–52). Furthermore, he testified that he has muscle spasms throughout his body, including in his lower and upper extremities. He stated that he has difficulty handling or holding items such as a pencil or a glass of liquid. (R. 62, 156). Sometimes his hands cramp, which causes him to clench items being held. (R. 62). Plaintiff testified that he also experiences

cramping in his back, arms, and legs, areas which were not severely burned or scarred. (R. 49, 151, 211).

He testified that he cannot stay on his feet for more than 15 to 20 minutes at a time, and that he cannot sit for more than 15 to 20 minutes. (R. 43). He further testified that the pain he experiences when standing is not alleviated by sitting. He stated that frequently he cannot drive an automobile because of cramping in his legs, (R. 61), and he cannot visit friends because of the muscle spasms. He also has trouble concentrating and reading. (R. 56). In addition, due to muscle cramping, Plaintiff stated that he cannot perform household chores, such as cooking and cleaning, and he often cannot socialize with his family and friends due to the pain and cramping that he experiences and his difficulty in sitting. (R. 52, 54–56, 144–47). Due to the pain in his legs and feet, Plaintiff stated that he sleeps only two to three hours a night. (R. 49, 211). He described the pain in his feet as like walking on gravel without shoes. (R. 49). Plaintiff further testified that he believes he is suffering from depression as a result of the chronic pain. However, he has never seen a psychiatrist. (R. 57). At the time of the hearing, Plaintiff wore a brace on his right leg and a corrective orthotic in his left shoe for balance. (R. 49–50).

Plaintiff's wife, Cheryl Michaels, described her husband as being in constant pain. She is aware of the pain that he experiences because he wakes up at night screaming of the pain in his legs and he is "up and down" all night and is often irritable. (R. 63–64). She testified that she can feel big knots under his skin, when he is having muscle cramps, which she massages to help relieve the cramping. (R. 64). She further testified that Plaintiff isolates himself from the family four days a week because the pain makes him so irritable. (R. 65).

At the hearing, the ALJ heard testimony from a medical expert, Dr. Daniel McNally,[5] an associate professor in the Division of Pulmonary Medicine at the University of Connecticut. Dr. McNally had reviewed Plaintiff's medical records that were introduced at the hearing and was present for the testimony of Plaintiff and his wife. (R. 66–90). Dr. McNally testified that there was sufficient objective medical evidence of record from which he could form an opinion as to Plaintiff's medical status. (R. 68). He testified that Plaintiff's problems started with the amputations his toes, which was done in response to the burns he had sustained as a child.[6] (R. 68). As a result, Plaintiff lost part of the supporting arches in his feet, which now means that he has to put weight on bones that were not intended to bear weight. Dr. McNally testified that this explained the feelings of pain that Plaintiff described and the rubbing sensation he experiences when he walks. (R. 69). Second, he testified, that as part of the same injuries, Plaintiff had burns and skin grafting on various parts of his feet and legs, which would cause increased sensitivity in those tissues and would also cause pain. (R. 69). Third, the EMG[7] results show that there is peroneal neuropathy,[8] both superficial and chronic deep neuropathy. (R. 69–70). These three fac-

---

5. Dr. McNally's *curriculum vitae* is Exhibit 22 in the Record, R. 193–95.

6. The medical records concerning these early surgeries are not part of the Record and were never supplied by Plaintiff's counsel.

7. The EMG was only performed on Plaintiff's lower extremities (*See* EMG Results at R. 175), and, therefore, did not measure nerve damage, if any, in Plaintiff's upper extremities. (R. 94).

8. "Peroneal" refers to the fibula or to the outer side of the leg; fibular. *Dorland's Illustrated Medical Dictionary* 1169 (25th ed.1974). "Neuropathy" refers to nerve damage or functional disturbances and/or pathological changes in the peripheral nervous system, which may result in pain, numbness, tingling, swelling, or flushing. *See Id.* at 1043; *The Merck's Manual of Medical Information* 336–37 (Home Ed.1997).

tors, Dr. McNally testified, explain Plaintiff's significant pain in his feet. (R. 70).

Dr. McNally further testified that he was unsure of the cause of the muscle cramping, although he suggested several possible explanations, and reiterated that Plaintiff had a "clearly documented and well-identified modus of a problem that gives him significant pain when walking." (R. 71–72). Dr. McNally also stated that walking exacerbated Plaintiff's condition, which was not relieved by rest. (R. 71–72). Dr. McNally opined that progress had been made by Plaintiff's use of orthotics, as demonstrated by Dr. Collins' notes, but observed that Plaintiff had failed to make marked improvement because, for some time, he had not been able to afford the cost of orthotics. (R. 72). (Plaintiff testified that he had not been able to afford much of the recommended treatment, including orthotics, regular treatment with a specialist in reconstructive and orthopedic surgery, and Soma medication, a muscle relaxant, because he did not have health insurance. (R. 50, 137, 148)).

Dr. McNally characterized Plaintiff's impairment as "severe."[9] (R. 73). He stated, however, that "[t]here is an unknown element in terms of the cramping which certainly would aggravate the other factors." (R. 73). Dr. McNally opined that the number of employment positions Plaintiff could hold would be limited due to his pain and inability to remain stationary and his difficulty in walking on surfaces that were not level. (R. 74–75). He testified that, in his opinion, Plaintiff's condition had worsened over time due to the aging and contracting of his scars, and the lack of orthotics over a number of years. (R. 76, 88–90). Dr. McNally concurred with the ALJ that the cramping and muscle

spasms in Plaintiff's upper extremities were somewhat puzzling due to the lack of scarring and burns to this area of his body. He suggested that a functional assessment by a psychiatrist and a neurological consultation would be helpful in determining Plaintiff's current condition and explaining the reasons for cramping in the upper extremities. (R. 79–80, 94).

The ALJ also heard brief testimony from Elizabeth Lloyd, a vocational expert.[10] The ALJ asked her to assume that all of the matters to which Plaintiff had testified were true, including the pain, the cramping, his not being able to stand or sit for more than 15 minutes, the spasms in the upper extremities and his impaired ability to walk, and then asked her whether there would be any work he could perform. Ms. Lloyd responded that she would need to know how frequently Plaintiff experienced the involuntary spasms of his extremities. (R. 94–95). No further testimony was elicited.

The ALJ stated that he would be ordering a neurological consultative examination and a functional assessment, to which Plaintiff's attorney concurred. The ALJ also asked Plaintiff's counsel to provide Plaintiff's earlier medical records. These, however, were never submitted.

On December 19, 1995, Dr. Steven Eisen, performed the first consultative examination of Plaintiff. He observed that Plaintiff could not walk without shoes, that he had gross failure of muscular coordination with shoes, and that he tended to fall to either the left or right side. (R. 213–14). Dr. Eisen also observed impairment of motor function in Plaintiff's lower extremities, with atrophy of most muscle groups. (R. 213–14). He noted Plaintiff's inability to ambulate heel-to-toe and to

9. Dr. McNally pointed out that the closest match between Plaintiff's condition and the Listings in Appendix 1 of 20 C.F.R. § 404.1520(d) was section 1.09 (amputation or anatomical deformity of both feet), but that Plaintiff's condition was not as severe as that described in this section. (R. 73–74, 79). He also discussed section 1.10 (amputation of

one lower extremity at or above the tarsal region), but stated that this section required a greater amputation than Plaintiff had experienced. (R. 78).

10. The *curriculum vitae* for Elizabeth Lloyd appears in the Record at R. 199–200.

perform tandem gait. (R. 214). He described Plaintiff as an "unusual case of progressive symptomatology," and recommended further studies including an electroencephalogram, EMGs, nerve conduction studies, and two CT scans. (R. 214). He indicated that once these studies were completed "any new issues can be addressed." (R. 214).

In April 1996, an EEG was performed at Veterans Memorial Medical Center. Dr. Edward Spellman read the EEG as "a normal awake and drowsy EEG." (R. 215).

Dr. Kenneth Kaplove, a board-certified neurologist, examined Plaintiff in April 1996, for the second consultative examination. He noted the burns on Plaintiff's legs and his right forearm. He stated that Plaintiff has no toes on the right foot and only stubs on the left. Plaintiff gave a history of having had multiple surgeries for his burns and having been in an automobile accident seven years before with resultant low back pain which acts up "now and then.". Plaintiff stated that he had taken Soma mediation in the past but was no longer taking any medication. After examining Plaintiff, Dr. Kaplove's impression was:

> Pain on the bottom of both feet. The patient's plantar surfaces of both feet are tender to pressure bilaterally. The patient also has cramping of the arms and legs, particularly at night, but occasionally during the day. He states that he cannot sit for a prolonged period of time, however he was able to sit fairly comfortably in the office for a prolonged period of at least fifteen minutes at a time. He is not able to walk without his shoes. Use of the legs seemed to spur some cramping, although no actual cramping was witnessed during the evaluation. No evidence of myotonia [11] was noted. No evidence of back dysfunction was noted. The patient's gait was reasonably steady, but vibration was dimin-

ished slightly in the feet, although this is difficult to evaluate because it is usually evaluated in the toes.

(R. 217–18). His recommendations were:
1) B12 and folate.
2) At this point, there is no evidence of a progressive neurologic disease, and the patient requires treatment of his pain, possible initially with tricyclics. In terms of the cramping, such things as quinine could be tried initially.

(R. 218).

Plaintiff had also submitted medical records from Gaylord Hospital, where he had treated with Dr. Michael Collins, a specialist in physical medicine and rehabilitation. (R. 158–89). The records cover the period June 1994 (shortly after Plaintiff filed his application for DIB and SSI) to November 1994. In June 1994, Dr. Collins' initial evaluation of Plaintiff indicated that Plaintiff had previously been seen at Gaylord in 1986 in the Amputee Department, where recommendations were made to him but not followed up because of financial problems. (R. 159–60). (We do not have copies of those records). According to the history taken by Dr. Collins, Plaintiff was complaining of muscle spasms which initially affected his lower extremities, but his condition worsened and the spasms now affected his upper extremities. Plaintiff indicated that he had never had any tests performed to determine the etiology of this condition. (R. 159). Plaintiff also complained of severe pain on the plantar surfaces of his feet that he experienced when walking. He stated that he could not walk up ramps and occasionally lost his balance.

Dr. Collins' examination of Plaintiff's upper extremities revealed only minor burns of "no functional significance." There was no evidence of atrophy or unusual hypertrophy or asymmetry in the upper extremities. (R. 159). Additionally, strength was

---

**11.** "Myotonia" is increased muscular irritability and contractility with decreased power of relaxation; tonic spasm of muscle. *Dor-* *land's Illustrated Medical Dictionary* 1013 (25th ed.1974).

without focal deficits, and the Plaintiff's reflexes were symmetrical and virtually absent. (R. 159). Dr. Collins' examination of Plaintiff's lower extremities showed total amputation of all toes on the right foot and stubs of toes on the left foot with callouses. (R. 159). He stated that the "only scar that appears to have functional significance is just medial to the popliteal fossa [12] on the right leg. This may contribute to limited knee extension, and there is evidence of periodic skin breakdown over this scar." (R. 160). He also observed bilateral muscle atrophy below the knees. Dr. Collins described Plaintiff's reports of fatigue and instability with walking; however, he noted that he did not observe such conditions. (R. 160). Dr. Collins also noted that Plaintiff was able to come to a standing position in his custom-molded shoes with soft inserts without difficulty and that Plaintiff's gait with orthotics appeared to be quite good, *i.e.* slightly wide-based and not hesitant. (R. 160). Dr. Collins reported that Plaintiff experienced hypersensitivity of the feet and the need to maintain skin integrity. He recommended a course of physical therapy and that Plaintiff visit the Prosthetics and Orthotics Department. (R. 160, 162, 185, 187). Plaintiff was seen three times at the Orthotics Clinic where he was fitted with new orthotics for both feet. (R. 185–89).

His review of the electrodiagnostic testing that he had ordered indicated a peroneal neuropathy predominately involving the superficial sensory division, as well as evidence of a chronic deep peroneal neuropathy of the feet. There was no evidence of myopathy.[13] (R. 174–75). On Plaintiff's return visit in September 1994, Dr. Collins observed improvement in the right extremity function, and Plaintiff reported that his right knee was now less likely to give way than it had previously. (R. 188). At the time of this examination, Dr. Collins did not observe any problems with Plain-

tiff's left gait. (R. 188). In November 1994, Plaintiff returned to Dr. Collins' office complaining of skin breakdown to his right foot and callouses on his left foot. The problem appeared to be the result of pressure being placed on the feet; consequently, extra padding was applied to the orthotics in the shoes. (R. 189). Despite the callouses on the left foot, Dr. Collins described Plaintiff's gait as quite good. (R. 189).

In June 1994, Dr. Rocco Cornacchia also examined Plaintiff at the request of the Bureau of Disability Determination. He reported that Plaintiff claimed disability on the basis of poor balance and discomfort with his legs and feet, but that "[a]t the time of the examination, he appeared to be in no acute distress and there were no difficulties of his extremities except for limping in ambulation." (R. 171–72).

In December 1994, Dr. Richard A. Matza, a reconstructive orthopaedic surgeon, examined Plaintiff primarily for complaints of bilateral foot pain. (R. 212). He observed pressure sores and callouses on Plaintiff's feet, status post toe amputations. (R. 212). He stated that Plaintiff had tenderness in both feet and recommended that Plaintiff be treated conservatively by an orthotist, with surgery only as a last resort. (R. 212).

On September 9, 1995, Plaintiff completed a form indicating that he had not been treated or examined by a doctor since November 14, 1994. (R. 201).

## DISCUSSION

### Standard of Review

Our review of a social security disability determination involves two levels of inquiry. First, we must first decide whether the Commissioner applied the correct legal principles in making the determination.

---

12. "Popliteal fossa" is the depression in the posterior region of the knee. *Dorland's Illustrated Medical Dictionary* 614 (25th ed. 1974).

13. "Myopathy" is the disease of a muscle. *Dorland's Illustrated Medical Dictionary* 1012 (25th ed. 1974).

Next, we must decide whether the determination is supported by substantial evidence. *See Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987). "Substantial evidence" is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Rodriguez v. Califano,* 431 F.Supp. 421, 423 (S.D.N.Y.1977). We may not decide facts, reweigh evidence or substitute our judgment for that of the Commissioner. *See Dotson v. Shalala,* 1 F.3d 571, 577 (7th Cir.1993); *Reyes v. Harris,* 486 F.Supp. 1063, 1067 (S.D.N.Y.1980). We must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings.

### *"Disability" under the Social Security Act*

Under the Social Security Act, in order to qualify for SSI or DIB,[14] an individual must be disabled, as that term is defined by the Act. "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see Rosa v. Callahan,* 168 F.3d 72 (2d Cir.1999). Further, "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see Bush v. Shalala,* 94 F.3d 40, 45 n. 3 (2d Cir. 1996).

The Social Security Administration has promulgated a five-step process for determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. First, the ALJ must determine whether the claimant is currently working. 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is currently employed, the claim is disallowed. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is denied. 20 C.F.R. §§ 404.1520(c), 416.920(c). Once the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations (the "listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d); *Bowen v. Yuckert,* 482 U.S. 137, 141, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). If the claimant's impairment meets or equals one of the impairments in the listings, the claimant is automatically considered disabled. 20 C.F.R. §§ 404.1520(d), 416.920(d); *see Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982). If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot perform his former work, the burden then shifts to the Commissioner to show that the claimant is prevented from doing any other work. A claimant is entitled to receive disability benefits only if he cannot perform any alternate gainful employment. 20 C.F.R. §§ 404.1520(f), 416.920(f).

The initial burden of establishing disability is on the claimant. *See* 42

---

**14.** In order to qualify for DIB, a person must meet both the earnings requirement and the disability requirement of the Act. (*See* R. 113–14).

U.S.C. § 423(d)(5). Once the claimant demonstrates that he is incapable of performing his past work, however, the burden shifts to the Commissioner to show that the claimant has the residual functional capacity ("RFC")[15] to perform other substantial gainful activity in the national economy. *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir.1986); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir.1980). This may require the application of the Medical–Vocational Guidelines ("the grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, which places claimants with severe exertional impairments who can no longer perform past relevant work into grid categories according to their RFC, age, education, and work experience, and dictates a conclusion of disabled or not disabled. 20 C.F.R. § 200.00, App. 2 to Subpt. P. A proper application of the grid makes vocational testing unnecessary. The grid, however, covers only exertional impairments; non-exertional impairments are not covered. 20 C.F.R. § 200.00(e)(2). As a general rule, if the grid cannot be used, *i.e.* when significant nonexertional impairments are present or when exertional impairments do not fit squarely within grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *Bapp v. Bowen*, 802 F.2d at 605.[16]

### The ALJ's Findings

Following receipt of the reports from the consultative examinations, the ALJ followed five-step evaluation process and determined that Plaintiff did not meet the definition of "disabled" because of his ability to perform sedentary work other than his past relevant work. (R. 19). The ALJ determined that Plaintiff had satisfied the first four steps. (R. 15). Although Plaintiff presented medical evidence of severe residual effects of burns, with amputation of the toes bilaterally, the ALJ found that his impairments failed to meet or equal any impairment listed in Appendix 1, Subpart P, of Regulations No. 4. *Id.* After thoroughly reviewing all of the medical evidence in the record, the ALJ concluded that it did not corroborate the claimant's allegations of disabling pain and his severe limitations. "The claimant's activities of daily living, his lack of effort to seek appropriate treatment for his pain and the types and dosage of any medications taken have also been considered. Accordingly, the claimant's allegations of disabling pain are not found to be credible to the degree alleged by the claimant." (R. 18).

Although the ALJ determined that Plaintiff was unable to perform his past relevant work as a sports club manager (R. 18–19), the ALJ held that, based on an exertional capacity for sedentary work,[17]

---

**15.** "Residual functional capacity" refers to the claimant's maximum sustained work capability for sedentary, light, medium, heavy or very heavy work. In assessing an individual's RFC, the ALJ is to consider his or her symptoms (such as pain), signs and laboratory findings together with the other evidence. 20 C.F.R. § 200.00(c).

**16.** *See* Discussion at 27–28, *infra*.

**17.** The ALJ determined that Plaintiff retained the residual functional capacity to perform sedentary work except for walking or standing for prolonged periods of time. (R. 18). "Sedentary work" is defined, in relevant part, in the Regulations as:

> involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small

tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). "Sedentary work" is further defined in SSR 83–10 as:

> By its very nature, work performed primarily in the seated position entails no significant stooping. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions. 'Occasionally' means occurring from very little to one-third of the time. Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8–hour

Plaintiff's age, education, and work experience, that Rule 201.26 of the grid,[18] Table No. 1, would direct a conclusion of "not disabled." (R. 19). Accordingly, he denied Plaintiff's application for DIB and SSI.

### The Parties' Contentions

The parties apparently agree that Plaintiff is not engaged in a substantial gainful activity, does not have an impairment that meets or equals a "listed" impairment, and that Plaintiff is incapable of performing his past relevant work. Thus, the issue on which they disagree is whether Plaintiff is capable of performing alternative work.

Specifically, Plaintiff challenges the ALJ's finding that his complaints of pain were not credible to the degree alleged. Plaintiff contends that his testimony was supported overwhelmingly by the objective medical evidence, including that of his treating physicians, the consultative examiners, and the medical expert who testified at the trial. Plaintiff further contends that the ALJ drew impermissible negative inferences from his lack of medical treatment for a period of eight years prior to his filing for disability benefits and from his statements regarding his daily activities. Plaintiff also contends that the ALJ failed to address the uncontroverted evidence of his nonexertional impairment of his inability to balance.

In response, Defendant argues that the ALJ's decision is supported by substantial evidence and warrants affirmance. Defendant asserts that a review of the record fails to provide objective medical support for Plaintiff's allegations, and instead supports the ALJ's finding that Plaintiff is capable of some work activity.

### I. Evaluation of Plaintiff's Subjective Complaints of Pain

The function of the ALJ includes evaluating the credibility of all witnesses, including the Plaintiff. *See Carroll v. Secretary of HHS*, 705 F.2d 638, 642 (2d Cir.1983). Although the ALJ is free to accept or reject the testimony of any witness, a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." *See Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir.1988) (citing *Carroll*, 705 F.2d at 643). The ALJ's findings must be consistent with the other evidence in the case. *Id.* at 261; *Smith v. Apfel*, No. 3:96CV1995(AWT), 1998 WL 893220, *9 (D.Conn. Sept. 28, 1998). After reviewing the ALJ's decision and the record in its entirety, this Court concludes that the ALJ's finding that Plaintiff's statements concerning his pain were not entirely credible was set forth with sufficient specificity to permit a meaningful review and that his finding was supported by substantial evidence.

Social Security Ruling 95–5p, 1995 WL 670415 (S.S.A.), sets forth the Social Security Administration's Policy Interpretation Ruling on Titles II and XVI "Considering Allegations of Pain and Other Symptoms in Residual Functional Capacity and Individualized Functional Assessments and Explaining Conclusions Reached." It provides in relevant part:

In instances in which the adjudicator has observed the individual, the adjudicator is not free to accept or reject that individual's complaints solely on the basis of such personal observations. Rather, in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a

---

workday, and sitting should generally total approximately 6 hours of an 8–hour workday.
1983 WL 31251, *5 (S.S.A.).

**18.** Rule 201.26 applies to younger individuals (ages 18 to 44), who can communicate in English, who do not have a high school education, who are restricted to sedentary work but who can perform a full range of sedentary work, and who have past work experience where the skills are transferable. 20 C.F.R. § 201.00(h).

*thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work....*

SSR 95–5p, 1995 WL 670415 (S.S.A.) (emphasis added).

In making his determination, the ALJ was required to consider the subjective complaints of pain by Plaintiff. *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir. 1979). However, it was within the discretion of the ALJ to give the subjective complaints of pain less weight relative to objective medical evidence. *Mongeur v. Heckler,* 722 F.2d 1033, 1037 (2d Cir.1983). In fact, the ALJ would have erred had he relied exclusively on Plaintiff's complaints of pain. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability"). As the ALJ noted in his decision (R. 17), in evaluating subjective symptoms such as pain, Plaintiff must first demonstrate the existence of a medically determinable impairment that could reasonably be expected to produce the symptom. After such an impairment has been identified, the intensity and persistence of Plaintiff's pain are evaluated based on all available evidence. The claimed pain will not be rejected simply because the objective medical evidence does not support the claim. Other factors that will be considered include the Plaintiff's medical history, diagnoses, daily activities, prescribed treatments, efforts to work and any functional limitations or restrictions caused by the pain. 20 C.F.R. § 404.1529; *Gonzalez v. Apfel,* 23 F.Supp.2d 179, 191–92 (D.Conn.1998).

The ALJ indicated that he had given consideration to pain "at each step of the required sequential evaluation" (R. 18) and that Plaintiff's "allegations of disabling leg and feet pain have been considered in accordance with [20 C.F.R. §§ 404.1529 and 416.929] and Social Security Ruling 96–3p.[19]" (R. 18). However, the ALJ found that the medical evidence did not corroborate Plaintiff's allegations of *"disabling pain and his severe limitations"* (R. 18) (emphasis added), based on his "activities of daily living, his lack of effort to seek appropriate treatment for his pain and the types and dosage of any medications taken have also been considered." (R. 18). Based upon the express requirements of the Regulations, these factors were appropriately considered by the ALJ. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (outlining the factors relevant to the claimant's symptoms of pain that should be considered, including his daily activities; the medications being taken or that have been taken; treatment that was received, etc.). Although the ALJ failed to include in his decision any personal observations of Plaintiff (on which he could not have relied exclusively, in any event), he thoroughly reviewed the medical evidence and testimony in the record, as well as the personal observations of the treating and consultative doctors.

Plaintiff admitted that he worked a variety of jobs for many years, probably none of which would be considered sedentary work, with varying degrees of exertional demands. Other than Plaintiff's own subjective complaints, there is no objective evidence in the record to explain the significant worsening in his condition in three years to the point that he could no longer work at even a sedentary job. The Functional Capacity Assessment performed by a Social Security Medical Consultant (R.

---

**19.** SSR 96–3p pertains to the consideration of pain and other symptoms in determining whether a medically determinable impairment is severe at the second step in the sequential evaluation process set forth in 20

C.F.R. §§ 414.1520, 416.920, and 416.924. In this case, the ALJ found that Plaintiff's impairment was severe and, obviously, Plaintiff is not challenging his finding in this regard.

103–09) in July 1994 indicated that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand at least two hours out of an eight-hour workday, sit about six hours, push and/or pull an unlimited amount other than as noted for lift and/or carry restrictions; he occasionally had postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. In his Disability Report (R. 136–41), dated April 26, 1994, Plaintiff reported that a doctor at Gaylord Hospital had told him that he should not be on his feet more than *four* hours a day. He also indicated that he was able to do some household chores, sweeping the floor and vacuuming (although he testified at the hearing that he did not do housework), and that he was able to drive an automobile up to two hours a day.

The ALJ carefully reviewed the 1994 evaluation by Dr. Collins, Plaintiff's primary treating physician (discussed above), who described Plaintiff's complaints of fatigue and instability but noted that he did not observe these symptoms during his examination and further noted that Plaintiff's gait was "actually quite good." After Plaintiff was given orthotics, within just a few months, Dr. Collins noted an improvement in the right extremity function and Plaintiff reported that his right knee was less likely to give way. Dr. Collins observed that, on the left side, Plaintiff's gait "looks good now." (R. 188). Dr. Collins had further noted that Plaintiff's range of motion in his upper extremities was normal; there was no atrophy or hypertrophy or asymmetry in the upper extremities.

The ALJ also considered the consultative examination of Dr. Kaplove in 1996 who found no evidence of progressive neurologic disease, and who observed that Plaintiff was able to sit in his office for 15 minutes and that his gait was reasonably steady. His only recommended treatment was B–12, folate, a tricyclic for pain, and possible quinine for cramping. The EEG

that was performed post-hearing was normal.

The ALJ also noted that Plaintiff had not been treating with any doctor for eight years prior to seeing Dr. Collins (whom he first saw after filing his application for Social Security disability benefits) and that he was not taking any medication on a regular basis. Plaintiff asserts that the ALJ drew an impermissible negative inference from this lack of treatment, which was due his lack of financial resources. We note that there is no evidence other than Plaintiff's testimony that he lacked medical insurance and was unable to afford the treatment. However, even assuming this was the case, in evaluating Plaintiff's subjective complaints of pain, it was proper for the ALJ to consider the fact that Plaintiff had been employed at non-sedentary jobs for four to five years during which time he was not under a doctor's care nor taking any medication for what he now claims to be a disabling condition.

Disability requires more than a mere inability to work without pain. *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir.1983). The ALJ did not discredit Plaintiff's complaints of pain entirely. He found instead that the medical evidence did not "corroborate" his allegations of *"disabling* pain." (R. 18). Based upon our careful examination of the entire record, including the Plaintiff's testimony, the medical evidence the functional assessment, the consultative examinations, and the medical expert testimony, as well as Plaintiff's work history and history of medical treatment, we find substantial evidence to support the ALJ's credibility determination as to Plaintiff's subjective complaints of pain. *See Dunn v. Chater*, 101 F.3d 1392, 1996 WL 387218, *3 (2d Cir.1996) (unpublished decision).

## II. Nonexertional Impairments

As explained at the outset, after finding that Plaintiff retained the residual

functional capacity to perform sedentary work, the ALJ applied the regulatory grids to conclude that Plaintiff was not disabled. Plaintiff argues that resort to the grids was improper not because the ALJ ignored evidence that he suffered from a nonexertional impairment of an inability to balance.

As the Second Circuit recently noted in *Rosa v. Callahan*, 168 F.3d 72, 81, , "[g]enerally speaking, if a claimant suffers only from exertional impairments, *e.g.*, strength limitations, then the Commissioner may satisfy [his] burden by resorting to the applicable grids.... Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, application of the grids is inappropriate." (Internal citations and quotations omitted). The Second Circuit has held, however, that it is not always necessary for the ALJ to consult a vocational expert whenever a claimant presents proof of a nonexertional impairment. *Bapp v. Bowen*, 802 F.2d at 601. Rather, the need for expert testimony is to be made on a case-by-case basis. It is only when a claimant's nonexertional impairments "significantly limit the range of work permitted by his exertional limitations," *id.* at 605, that the grids will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments. Accordingly, where the claimant's work capacity is *"significantly diminished* beyond that caused by his exertional impairment the application of the grids is inappropriate." *Id.* at 605–06 (emphasis added). The Court in *Bapp* further elaborated on the meaning of "significantly diminished," stating that it referred to the "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id.* at 606.

In this case, Plaintiff points to his loss of balance as the nonexertional impairment that the ALJ should have considered out-side of the grids. However, a review of Plaintiff's testimony indicates that his primary complaints were of muscle cramps, pain, difficulty pushing and pulling, difficulties standing and sitting. His only mention of lack of balance was in connection with his quitting his job with Orkin Lawn Care after two to three weeks because he lost his balance on the uneven ground. (R. 59). In his initial Disability Report, he also makes no mention of loss of balance, but in the Reconsideration Disability Report (R. 150–53), dated August 5, 1994, he does mention increasing problems with his balance.

On the other hand, in September, 1994, Dr. Collins observed the considerable improvement Plaintiff had made with the use of orthotics; in 1996, Dr. Kaplove observed a "reasonably steady" gait; Dr. Eisen, however, did note difficulty with walking and balance. Dr. Cornacchia, who had examined Plaintiff for the Connecticut Bureau of Disability, on June 13, 1994, noted that although Plaintiff was claiming disability on the basis of his poor balance and discomfort in this legs and feet, Plaintiff appeared in no acute distress and the doctor observed no difficulties in his extremities except limping in ambulation. (R. 172). Although there is some conflict in the medical evidence concerning the degree of Plaintiff's problem with balance, it appears that once he was treated with properly fitting orthotics, this problem resolved to a large degree. Significantly, no doctor who examined Plaintiff described such significant problems with balance that walking or standing was contraindicated. Clearly, the medical records do not paint a picture of an individual whose problems with balance are so severe as to significantly limit his ability to carry out a sedentary job.

Based on our review of the record as a whole, we do not find sufficient evidence to support Plaintiff's claim that his difficulty with balance significantly limited the range of work that he could otherwise perform given his exertional limitations, which were

clearly the focus of his testimony and complaints to his treating and consultative physicians. Therefore, we do not find an error as a matter of law in the ALJ's use of the grids without further testimony from the Vocational Expert.

### CONCLUSION

Although Plaintiff's situation is a very unfortunate one, given the severe burns that he sustained as a young child and with which he had to live, we find substantial evidence in the record to support the Commissioner's decision that Plaintiff is not disabled as that term is defined by the Social Security Act. If there is substantial evidence to support the Commissioner's findings, they are conclusive and may not be questioned by the District Court. 42 U.S.C. § 405; *Bush v. Shalala,* 94 F.3d at 45. Accordingly, for the reasons stated above, Defendant's Motion for Order Affirming the Decision of the Commissioner [Doc. # 11] is GRANTED and Plaintiff's Motion for Summary Judgment [Doc. # 8] is DENIED.