John DELVALLE

v.

Kenneth S. APFEL, Commissioner
of Social Security

No. 3:97CV2234 (AWT).

United States District Court,
D. Connecticut.

Sept. 21, 1999.

Robert Reger, Hamden, CT, for Plaintiff.

Deidre Anne Martini, U.S. Attorney's Office, Bridgeport, CT, for Defendant.

*ENDORSEMENT ORDER*

THOMPSON, District Judge.

Upon review and pursuant to 28 U.S.C. § 636(b) and Rule 2 of the Local Rules for United States Magistrate Judges (D.Conn.), Magistrate Judge Martinez's recommended ruling on pending motions [doc. # 14] is hereby **ACCEPTED**.

SO ORDERED.

*RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER*

MARTINEZ, United Staes Magistrate Judge.

The plaintiff, John DelValle, filed this action seeking review, pursuant to 42 U.S.C. § 405(g), of the decision of the Commissioner denying his claim for disability benefits under the Social Security

Act. Pending before this court are the Plaintiff's Motion for Summary Judgment and the Defendant's Motion for Order Affirming the Decision of the Commissioner. The court recommends that the plaintiff's motion (doc. # 8) be GRANTED and the defendant's motion (doc. # 11) be DENIED.

## I. *PROCEDURAL HISTORY*

On March 14, 1993, the plaintiff filed an application for disability benefits, claiming that he was disabled as of August 2, 1991 due to a heart condition and back pain. (R.[1] at 49.) His application for benefits was denied on August 18, 1993. (R. at 53.) In response to the plaintiff's request for reconsideration dated September 2, 1993, the defendant issued a notice of reconsideration on December 27, 1999 upholding the denial of benefits. Subsequently, the plaintiff filed a request for a hearing. A hearing was held on May 19, 1995 before an administrative law judge ("ALJ"). (R. at 12–25.) Later, the plaintiff submitted new evidence in support of his claim and requested that the Appeals Council review the denial of his claim. (R. at 10.) The Appeals Council upheld the denial of his claim, concluding that the ALJ's decision was proper and that the additional evidence failed to provide a basis for changing the ALJ's decision. (R. at 6.) The plaintiff now appeals from the decision of the Appeals Council.

## II. *BACKGROUND*

### A. *The Plaintiff's Testimony*

The plaintiff testified[2] that he was born on June 3, 1947 and has an eighth grade education. (R. at 49.) Prior to 1991, he was employed as a machine operator. (R. at 49.) As a machine operator, he was required to operate machinery and equipment, constantly stand and bend, frequently reach, occasionally sit and walk, and lift up to fifty pounds. (R. at 20.) The plaintiff last worked on August 21, 1991.

The plaintiff went on to say that:

he left employment in 1991 because of a heart attack. He returned to work for about one week, but experienced chest pain, back pain, headaches, and dizziness... He alleged that he had pain constantly and it often spread through his back, neck, arms, and hands ... He also described episodes of shortness of breath while in bed, sitting down and arising from either position. As for his back pain, [the plaintiff] stated he had muscle spasms in his back, legs, shoulders, and arms for many years. In addition, [he] experiences a sensation of pins and needles in his knees, shoulders, mid back, and stomach, particularly when sitting or standing for a prolonged period. Lastly, [the plaintiff] testified that he is depressed and feels his condition is worsening.... He alleges that Dr. Carbone at Bridgeport Community Health Center discussed the possibility of back surgery to remove a tumor ...

(R. at 18.)

[The plaintiff] further testified about his functional abilities as being limited daily according to how he feels. Activity tends to intensify his discomfort and he was directed by his doctor about ten to twelve years ago not to exercise. Presently, he is able to walk, but after about five minutes a burning sensation develops in his chest. Whether he can lift depends on from what height. In a comfortable seat, [the plaintiff] explained that he could sit for one-half

---

**1.** The record of the administrative proceedings related to this case will be referred to as "R".

**2.** In his ruling, the ALJ refers to testimony that the plaintiff allegedly gave at the hearing. The transcript that was provided to the court does not contain such references; it is apparent that the court reporter had trouble with the tapes of the hearing and the referenced portions may be missing. In any event, because the plaintiff does not challenge the accuracy of the ALJ's recitation of his testimony, the court assumes that the ALJ's recitation of the plaintiff's testimony is accurate.

hour and between ten and fifteen minutes in a hard seat. Furthermore, since his stroke, [the plaintiff] claims that he has had memory problems, both short term and long term. (R. at 19.)

[The plaintiff] testified that on a daily basis he experiences problems sleeping ... but has refused his doctor's recommendation to take medication. His daily activities include cooking, doing laundry, cleaning, shopping, visiting with friends, and going to church... [The plaintiff] continues to drive and has no problems caring for his personal needs. He even stated in a disability report that during visits with friends they occasionally take walks. (R. at 19.)

### B. *Medical Expert's Testimony*

The ALJ next heard testimony from a medical expert,[3] Dr. George Kiss, who testified as to the plaintiff's medical condition. (R. at 33.) Dr. Kiss testified that the plaintiff suffers from ischemic heart disease, a condition which is found in 4.04C of the Listing.[4] Dr. Ki The plaintiff testified that § testified that the plaintiff had a 100% blockage of the left anterior descending ("LAD") artery, which exceeded the percentage required for a finding of disability in accordance with 4.04C. (R. at 36.)

3. Dr. Kiss appeared and testified at the hearing in the capacity of a medical advisor. He was retained by the Social Security Administration to review the plaintiff's medical records and to render his opinion as to whether the plaintiff was disabled.

4. Section 4.04C (20 C.F.R. Pt. 404, Subpt. P, App. 1 (1998)) provides in pertinent part: *Ischemic heart disease,* with chest discomfort associated with myocardial ischemia ... while on a regimen of prescribed treatment ... with one of the following....
C. Coronary heart disease, demonstrated by angiography ... and an evaluating program physician, preferably one experienced in the care of patients with cardiovascular disease, has conclude that performance of exercise testing would present a significant risk to the individual with both 1 and 2:
  1. Angiographic evidence revealing:

In response to questioning by the ALJ as to whether the medical evidence demonstrated whether the plaintiff's condition met the criteria of 4.04C, Dr. Kiss responded, "I think as listed here the criteria were ... met." (R. at 36.)

Dr. Kiss next addressed the plaintiff's spinal condition. Dr. Kiss testified that the record was lacking in clinical evidence. (R. at 39–40.) He did note, however, that the plaintiff had a history of low back pain and that a diagnostic imaging report in his records revealed a significant abnormality. (R. at 40.) He noted that the records revealed disc herniation with intraspace narrowing. (R. at 41.) He was unable to interpret the MRI film that was in the records, but nevertheless guessed that it might reveal the presence of a tumor and that the condition could very well be painful. (R. at 41.) He also stated that, before he could render his medical opinion as to whether the plaintiff's back condition rendered him disabled, "[w]hat we would need would be a good examination documentation, examination and impression and recommendations." (R. at 40.)

### C. *The Medical Records*

The plaintiff's medical records reveal that in or about 1984, he was diagnosed with severe coronary disease and underwent catheritization. (R. at 137–38.) He

  a. 50 percent or more narrowing of a nonbypassed left main coronary artery; or
  b. 70 percent or more narrowing of another nonbypassed coronary artery; or
  c. 50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or
  d. 50 percent or more narrowing of at least 2 nonbypassed coronary arteries; or
  e. Total obstruction of a bypass graft vessel; and as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though the individual is comfortable at rest.
  2. Resulting in marked limitation of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort or ordinary physical activity, even though the individual is comfortably at rest.

had a totally occluded LAD with collateral filling. (R. at 137–38.) Between 1989 and 1991, he suffered a large anterior wall myocardial infarction and a stroke. (R. at 137.) On July 29, 1989, he was admitted to Beth Israel Hospital in Passaic, New Jersey complaining of the sudden onset of weakness on the left side of his face and left upper extremity. He was diagnosed with a right temporal lobe infarction and coronary artery disease. The records note an old myocardial infarction. (R. at 486–87.) He was treated and discharged on August 11, 1989 in stable condition. (R. at 486–87.)

On August 2, 1991, the plaintiff was again hospitalized for complications due to his heart condition. He was admitted to General Hospital Center in Passaic, New Jersey after an episode of orthostatic[5] hypotension and syncope.[6] (R. at 462.) At the time of admission, he also complained of lower back pain radiating into his left leg. (R. at 462.) He was diagnosed with orthostatic hypotension caused by the application of a topical nitroglycerin ointment and spondylosis.[7] (R. at 461.)

On August 21, 1991, the plaintiff had an MRI which revealed a congenitally narrow lumbar canal from L1–L2 through L4–L5. (R. at 125.) In addition, the MRI revealed a small disc protrusion at L5–S1 that was consistent with a diffuse bulge of the annulus fibrosis.[8] (R. at 125.)

The plaintiff again experienced chest pain in March, 1992. He was admitted to Yale–New Haven Hospital with complaints of chest pain radiating into his back, shortness of breath and dizziness. (R. at 127.) He was under the care of Dr. Lee and Dr. Drucker, who determined that the plaintiff had sustained a subendocardial myocardial infarction. (R. at 137–38.) Tests upon admission revealed a depressed ejection fraction[9] in the 30–40% range. (R. at 128.) His doctors agreed that he most likely had an old anterior septal wall myocardial infarction secondary to an LAD lesion. (R. at 129.) His condition was secondary to an ulcerated plaque in his right coronary or left circulation. (R. at 129.) In addition to complaints related to his heart condition, the plaintiff also complained of low back pain. (R. at 129.) Upon evaluation, lumbo-sacral spine x-rays were negative. (R. at 12.) By May 1992, his cardiac condition was stable. (R. at 137.)

On November 9, 1992, the plaintiff was evaluated by Dr. Ayoub, an internist. (R. at 234.) The plaintiff said he had suffered two heart attacks and a stroke and that he was fully recovered except for occasional numbness on the left side of his face and left leg. (R. at 234.) He reported frequent palpitations and dizziness as well as chest pain radiating into his extremities. (R. at 234.) The plaintiff also said he was experiencing moderate chest pain which radiated into his left arm. (R. at 235.) Upon examination, Dr. Ayoub concluded that the plaintiff suffered coronary artery

5. "Orthostatic" is defined as "pertaining to or caused by standing erect." *Dorland's Illustrated Medical Dictionary*, p. 1194 (28th ed.1994).

6. "Syncope" is defined as "a fainting or swooning; a sudden fall of blood pressure or failure of the cardiac systole, resulting in cerebral anemia and subsequent loss of consciousness." *Stedman's Medical Dictionary*, p. 1382 (5th ed.1982).

7. "Spondylosis" is defined as "vertebral ankylosis; this term is often applied nonspecifically to any lesion of the spine of a degenerative nature." *Stedman's Medical Dictionary*, p. 1322.

8. "Annulus" is defined as "a ring or ringlike structure." *Dorland's Illustrated Medical Dictionary*, p. 87.

9. "Ejection Fraction" is defined as "systolic volume/end diastolic volume. [Blood pressure—the pressure of the blood on the walls of the arteries...the maximum pressure occurs near the end of the stroke output...and is termed...systolic pressure...the minimum pressure occurs late in the ventricular diastole and is termed...diastolic pressure.]" *Dorland's Illustrated Medical Dictionary*, p. 1350.

disease and advised him to avoid all heavy duty activities. (R. at 236.)

From April to October 1993, the plaintiff was treated at the Bridgeport Community Health Center for follow-up care. (R. at 152–58.) His heart condition remained fairly stable during that time although 'he periodically complained of back pain. (R at 152–58) At approximately the same time, he was treated at the Bridgeport Hospital Outpatient Clinic. (R. at 159–62.) The medical notes indicate that his condition was stable. (R. at 159–62.)

The plaintiff had a stress test on May 27, 1993. (R. at 163.) He exercised for 9 minutes before stopping and complaining of fatigue and back pain. (R. at 163.) An EKG revealed a right bundle branch block with a left axial deviation and evidence of a myocardial infarction. (R. at 163.) The test did not reveal evidence of ischemia.[10] (R. at 163.)

On June 6, 1993, the plaintiff was admitted to Bridgeport Hospital with complaints of chest pain. (R. at 149.) He was released to Dr. Carbone's care. (R. at 149.) On June 16, 1993, a multi-gated cardiac scan revealed evidence of multi-vessel disease with moderate reduction in global function. (R. at 164.)

On November 9, 1992, Dr. Lee examined the plaintiff and determined that his cardiac condition was stable. (R. at 135.) Dr. Lee placed the plaintiff on chronic medication with an eye toward reducing his risk for future coronary thrombosis and stroke. (R. at 137.) He was advised to refrain from moderate to heavy levels of exertion and to avoid conditions of excess stress. (R. at 137.)

On May 19, 1993, the plaintiff was evaluated by Dr. Mark Waynik, a psychiatrist. (R. at 131.) He complained of episodic insomnia, decreased concentration, depression and mild anxiety. (R. at 131.) Dr. Waynik determined that he suffered from dysthymia[11] and chronic pain. (R. at 142.)

The plaintiff was next evaluated by Dr. Anand, an internist, on May 28, 1993. (R. at 144–46.) Dr. Anand noted that, upon examination, the plaintiff was able to walk, sit and stand "for a fair length of time." (R. at 144.) He further noted that he did not suffer an impairment of his speech, hearing or vision. (R. at 144.) The plaintiff complained of low back pain, which Dr. Arand reported to be a "mild, nagging kind of pain" for which the plaintiff took no medication. (R. at 144.) After an examination which included x-rays of the plaintiff's chest and back, Dr. Arand diagnosed cardiomegaly[12] and noted that there was no evidence of active disease in his back. (R. at 145–46.)

By August 1993, the plaintiff's heart condition was again stabilized. (R. at 153.)

On January 27, 1994, the plaintiff was admitted, via the emergency room, to St. Joseph's Hospital in Paterson, New Jersey. (R. at 168.) He presented with complaints of severe chest pain and was diagnosed with cardiac arrhythmia. (R. at 168.) He was tested, evaluated and released on February 2, 1994 with instructions to follow up with his own doctor in Connecticut. (R. at 171.)

The plaintiff reported to the Bridgeport Community Health Center for follow up care on numerous occasions from March 9, 1994 to July 15, 1994. (R. at 191–92.) On July 18, 1994, he had another stress test.

10. "Ischemia" is defined as "deficiency of blood in a part, usually due to functional constriction or a dual obstruction of a blood vessel." *Dorland's Illustrated Medical Dictionary*, p. 861.

11. "Dysthymia" is defined as "a mood disorder characterized by depressed feeling (sad, blue, low, down in the dumps) and loss of interest or pleasure in one's usual activities and in which the associated symptoms have persisted for more than two years but are no severe enough to meet the criteria for major depression." *Dorland's Illustrated Medical Dictionary*, p. 519.

12. "Cardiomegaly" is the enlargement of the heart. *See Dorland's Illustrated Medical Dictionary* at pp. 268, 802.

(R. at 195.) He exercised for 7 minutes before he stopped due to leg fatigue. (R. at 195.) A resting EKG revealed a right bundle branch block and an anterior wall myocardial infarction. (R. at 195.) He also appeared to be experiencing atrial fibrillation. (R. at 195.)

In a letter dated April 26, 1994, Drs. Watts and Babb, treating physicians, related that since the plaintiff's heart attack in 1992, he was doing well and only had one episode of chest pain. (R. at 200.) The plaintiff denied experiencing any other symptoms. (R. at 200.) On April 25, 1994, he was examined by Dr. Babb and the findings were unremarkable although he did express concern about the plaintiff's cholesterol levels and ejection fractions.[13] (R. at 200.) Dr. Babb instructed the plaintiff to return for follow up care in six months. (R. at 201.)

In October of 1994, the plaintiff continued to complain of back pain and an MRI was performed. (R. at 450.) It revealed right central disc herniations at C5–C6 and C6–C7 along with slight compression and rotation and displacement of the spinal cord. Lesions were also noted at C5–C6 and C6–C7. (R. at 450.)

## III. STANDARD OF REVIEW

The scope of review of a social security disability determination involves two levels of inquiry. The court must first decide whether the Commissioner applied the correct legal principles in making the determination. Next, the court must consider whether the determination is supported by substantial evidence. See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir.1998).

Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Yancey v. Apfel, 145

F.3d 106, 110 (2d Cir.1998). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. See Gonzalez v. Apfel, 23 F.Supp.2d 179, 189 (D.Conn.1998); Rodriguez v. Califano, 431 F.Supp. 421, 423 (S.D.N.Y.1977). The court may not decide facts, reweigh evidence or substitute its judgment for that of the Commissioner. See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir.1993). The court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. Furthermore, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a plaintiff will be deprived of the right to have [his] disability determination made according to correct legal principles." Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir.1998)(quoting Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir.1987)).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. See 42 U.S.C. § 423(a)(1). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1).

The determination of whether a plaintiff has a "disability" is a five-step process. See 20 C.F.R. § 404.1520. First, the agency must determine whether the plaintiff is currently employed. See 20 C.F.R. §§ 404.1410(b), 404.1572(b). If he is, the claim is disallowed. See 20 C.F.R. § 404.1520(b). If the plaintiff is not working, the agency must next determine whether he suffers from a severe mental or physical impairment; if none exists, the

---

**13.** At the time of his last test, the plaintiff's ejection fraction registered at 34%. (R. at 201.)

claim must be denied. *See* 20 C.F.R. § 404.1520(c). If the plaintiff is found to have a severe impairment, the agency must engage in the third step; that is, it must compare the impairment with those listed in appendix 1 of the regulations (the "Listings"). *See* 20 C.F.R. § 404.1520(d); *Bowen v. Yuckert,* 482 U.S. 137, 141, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Balsamo v. Chater,* 142 F.3d at 79–80. If the plaintiff's impairment meets or equals one of the impairments in the Listings, the plaintiff is automatically considered disabled. *See* 20 C.F.R. § 404.1520(d); *Balsamo v. Chater,* 142 F.3d at 80. If the plaintiff's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(e). If the plaintiff cannot perform his former work, he must show, as a fifth and final step, that he is prevented from doing any other work. A plaintiff is entitled to receive disability benefits only if he cannot perform any alternate gainful employment. *See* 20 C.F.R. § 404.1520(f).

## DISCUSSION

### A. *The ALJ's Findings and Conclusions*

The ALJ applied the five step evaluation process. First, he found that the plaintiff was not currently employed. Second, he found that the plaintiff suffered from two severe impairments: coronary heart disease and disc disease.[14] He also determined that the plaintiff suffered from dysthymia, a "non-severe" impairment. (R. at 21.) Next, the ALJ compared the plaintiff's physical impairments to the Listings and concluded that he was not disabled. In finding that the plaintiff's coronary heart disease did not constitute a disability, the ALJ rejected the plaintiff's complaints of functional limitations and relied upon his treating physicians' statements that the plaintiff's heart condition was sta-

ble and that his only restriction was to avoid moderate to heavy lifting and excess stress. (R. at 17, 19.) With regard to the plaintiff's back, the ALJ found that "although the [medical] reports reveal a significant abnormality, they are inconclusive in the absence of a good physical examination to correlate clinical findings." (R. at 16.) The ALJ noted that although the plaintiff was afforded the opportunity to submit additional medical records to support his claim, he declined to do so. (R. at 16.)

Next, the ALJ found that although the plaintiff was no longer able to work as a machine operator, he had the residual functional capacity to perform work at a light level of exertion. In reaching this conclusion, the ALJ assessed the plaintiff's credibility and weighed his testimony against the objective medical evidence. He found that the plaintiff's subjective complaints were not credible, that his heart condition was stable and that the only restrictions imposed upon him were to avoid moderate to heavy lifting. (R. at 17, 19.) Finally, the ALJ found that, based on the plaintiff's education, skills and age, there were a significant number of jobs that he was capable of performing. (R. at 21.)

### B. *The Cross Motions*

The plaintiff raises two grounds in support of his request for remand. First, he claims that the new evidence submitted to the Appeal Council warrants a remand because it substantiates his claim that he is disabled. Second, he claims that there is substantial evidence in the record to support a finding of disability.

### 1. *New Evidence*

The plaintiff asserts that his case should be remanded so that the ALJ may consider two new medical reports which support

---

**14.** The ALJ found that the plaintiff's history of disc disease dated back to only September 1994.

his claim that he is disabled. (R. at 491–94.) The plaintiff argues that these new exhibits "provide good clinical[,] physical and mental evaluation[s] of ... [his] disabilities and clearly establish [his] entitlement to [a] finding of disability as of August, 1991." Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, doc. # 9, at 7. The Commissioner, on the other hand, argues that this court should not consider the additional medical reports because they are not material and because the plaintiff has not demonstrated good cause for their late submission.

In *Perez v. Chater*, the Second Circuit held that "new evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision." 77 F.3d 41, 45 (2d Cir.1996). Such is the case here; after the ALJ rendered his decision denying him benefits, the plaintiff submitted two additional medical reports to the Appeals Council. These reports are thus part of the administrative record this court.

The government, in making its argument that the new evidence should not be considered, relies on *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir.1988) and *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir.1991). The government's reliance on these cases is misplaced.

In *Tirado*, the Second Circuit held that before a court may consider new evidence which was not first presented during the administrative proceedings, a social security plaintiff must demonstrate good cause for his failure to present the evidence earlier. *See*, 842 F.2d 595, 597 (2d Cir.1988); *Jones v. Sullivan*, 949 F.2d 57; *see also* 42 U.S.C. § 405(g).

■ A plaintiff ordinarily must demonstrate good cause when he, for the first time on appeal to the district court, presents new medical evidence in support of

his claim. That statutory requirement, however, is inapplicable here where the plaintiff submitted the new reports during the administrative process. As explained by the Second Circuit,

> In promulgating § 404.970(b) and § 416.1470(b), the Secretary expressly authorized plaintiffs to submit new evidence to the Appeals Council without a "good cause" requirement. Cf. 42 U.S.C. § 405(g)(stating that the district court may order additional evidence to be taken before the Secretary, but only upon a showing "that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.") The only limitations stated in these rules are that the evidence must be [1] new and [2] material and [3] that it must relate to the period on or before the ALJ's decision. This regulation was promulgated by the Secretary to provide plaintiffs a final opportunity to submit additional evidence before the Secretary's decision became final. Accordingly, ignoring this new evidence on judicial review would undermine the purpose of the regulation.

*Perez v. Chater*, 77 F.3d at 45.

■ The test as set forth in *Perez* is clearly met here. "New" evidence is simply that evidence which has not been considered previously during the administrative process. *See Bomes v. Schweiker*, 544 F.Supp. 72, 75 (D.Mass.1982); *Szubak v. Secretary of Health & Human Servs.*, 745 F.2d 831, 833 (3d Cir.1984). Moreover, to be considered "new" evidence, the medical reports may not be cumulative to those already contained in the record. *See Tirado v. Bowen*, 842 F.2d at 595. The two reports at issue here are clearly "new" evidence. The record was practically devoid of medical evidence concerning the plaintiff's back condition. Indeed, the ALJ noted the lack of such evidence. Second, the reports are clearly material.[15] *See id.*

---

15. The first report, dated July 22, 1993 is authored by Dr. Myron E. Brazin, a board

at 597 (evidence is material if it is relevant to the plaintiff's condition during the time period at issue and it is probative). Finally, they relate to the period of time at issue before the ALJ.

The court also notes that the new reports are likely to impact the ALJ's findings regarding the plaintiff's credibility, and thus may influence his findings as to whether the plaintiff's heart condition amounts to a disability and whether the plaintiff has the residual functional capacity to perform work. *See* R. at 19 (rejecting the plaintiff's complaints of functional limitations as to his heart condition and finding that "there is no objective medical evidence that confirms the subjective complaints and functional limitations to the extent to which [the plaintiff] alleges."); R. at 21 ("[The plaintiff's] subjective allegations of functional limitations are not credible, particularly regarding his back pain prior to September, 1994.")

Considering the entire medical record, in conjunction with the two additional reports, the court concludes that remand is proper. Upon remand, the Commissioner is directed to evaluate the evidence, including the two new reports, to determine whether the plaintiff's medical conditions constitute disabilities within the meaning of the Social Security Act.

### 2. Substantial Evidence

The government claims that the ALJ's decision should stand because there is substantial evidence in the record to uphold the ALJ's finding that the plaintiff failed to prove the second criteria of the Listing for ischemic heart disease. *See* fn. 2. The plaintiff, on the other hand, maintains that there is substantial evidence in the record to support a finding that his cardiac condition constitutes a disability.[16]

certified psychiatrist and neurologist. (R. at 491–92.) The report reveals that the plaintiff was injured on March 11, 1991 when he was lifting 250 pound rolls during his employment. In or around August, 1991, it was determined that the plaintiff suffered from a herniated disc. Upon examination, Dr. Brazin noted that the plaintiff had limited flexion as well as tenderness and spasm in his lumbar spine. He had a flattening of the lumbar lordosis and he moved stiffly and rigidly. Dr. Brazin determined that he had a 35% Partial Total Disability resulting from lumbar radiculopathy. In addition, Dr. Brazen evaluated the plaintiff's mental condition and noted that he was depressed and expressed feelings of hopelessness and pessimism. He concluded that the plaintiff had a 20% partial total neuropsychiatric disability for depression. Dr. Brazin, taking into consideration the plaintiff's heart condition and back problems, concluded that he was 100% totally and permanently disabled. (R. at 491–92.)

The second report, dated July 22, 1993, was authored by Dr. Horia H. Schwartz as part of a neurological and psychiatric consultation. (R. at 493–94.) At the time of the examination, the plaintiff reported persistent low back pain which radiated into his legs. He was often awakened by pain. He found standing and walking difficult and had greatly reduced his activities in light of his symptoms. His pain affected his ambulation and he walked more slowly and rested often. He reported staying at home more frequently and needed

assistance with tasks such as getting in and out of cars and kneeling or bending. Upon physical examination, Dr. Schwartz noted a reduced range of motion. He was diagnosed with permanent residuals of contusions and strain of the lumbosacral spine coupled with mild myofascitis and radiculopathy in the L5–S1 root. Dr. Schwartz concluded that the suffered a permanent residual disability of 30%. His prognosis was poor, particularly in light of the plaintiff's cardiac condition. Dr. Schwartz found him to be 100% disabled. (R. at 493–94.)

16. The court notes that the plaintiff has confused his burden of proof on appeal to this court. The issue on appeal is not whether there is substantial evidence to support a finding of disability. Rather, the Social Security Act states that "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." *See* 42 U.S.C. § 405(g). It is possible that in a particular case, there is substantial evidence to support both a claim for disability or a decision denying the claim. Plaintiffs who argue on appeal that they are entitled to a remand because their allegations of disability are supported by substantial evidence are "missing the mark." Hon. Thomas P. Smith and Patrick M. Fahey, *Some Points on Litigating Title II and Title XVI Social Security Disability Claims in United States District Court*, 14 QLR 243, 249 (citing *Cintron v. Bowen*, No. B–86–195, slip op. at 2 (D.Conn. Nov. 21, 1986)).

In light of this court's recommended ruling that the case be remanded to the ALJ for consideration of new evidence, it is unnecessary for the court to reach this issue.

## IV. *CONCLUSION*

For the foregoing reasons, the court recommends that the Plaintiff's Motion for Summary Judgment (doc. #8) be GRANTED and the Defendant's Motion for Order Affirming the Decision of the Commissioner (doc. #11) be DENIED.

Any party may seek the district court's review of this recommendation. *See* 28 U.S.C. § 636(b)(written objections to proposed findings and recommendations must be filed within ten days after service of same); Fed.R.Civ.P. 6(a), 6(e) & 72; Rule 2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; *Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.1992) (failure to file timely objections to Magistrate Judge's recommended ruling waives further review of the ruling).

September 2, 1999.