Daniel KYLE, Plaintiff,

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

**No. Civ. A. 3:99CV820 (WWE).**

United States District Court,
D. Connecticut.

May 19, 2000.

Charles E. Binder, Binder & Binder, Hartford, CT, for Plaintiff.

John B. Hughes, U.S. Attorney's Office, New Haven, CT, Deirdre Anne Martini, Ann M. Nevins, U.S. Attorney's Office, Bridgeport, CT, for Defendant.

*RULING ON PENDING MOTIONS*

EGINTON, Senior District Judge.

This is an action under section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in which plaintiff, Daniel Kyle, seeks review of the Commissioner's denial of his claim for disability insurance benefits.

Plaintiff filed an application for Social Security Disability benefits on November

27, 1995. On initial review and upon re-consideration by the Social Security Administration his application was denied. Following an administrative hearing on his claim, the Administrative Law Judge ("ALJ") found that the plaintiff is not disabled because he retains the functional capacity to perform the full range of exertionally light work.

On July 17, 1997, the plaintiff appealed the ALJ's decision to the Appeals Council, submitting additional medical evidence in support of his claim. By letter dated March 11, 1999, the Appeals Council declined to review the findings of the ALJ, making the decision of the ALJ the final decision of the Commissioner of Social Security, and making this case ripe for review by this Court.

Pending before the Court is the plaintiff's motion for an order reversing the decision of the Commissioner, and the defendant's motion for an order affirming the decision of the Commissioner. For the following reasons, plaintiff's motion [Doc. # 7] will be granted to the extent that the decision of the Commissioner is reversed and the case remanded for further proceedings, and the defendant's motion [Doc. # 11] will be denied.

### FACTS

Plaintiff Daniel Kyle was born on February 5, 1968. He did not complete his high school education. (Tr. 42). His past work experience includes being a landscaper, a telephone surveyor and a maintenance worker. (Tr. 72–73, 171).

Plaintiff suffers from blindness in his right eye due to retina detachment, blurred vision in the left eye, hepatitis C, liver disease, recurrent aspiration pneumonia, hypertension and depression. Plaintiff is also on methadone treatment from his pre–1994 heroin addiction, and complains of experiencing hot and cold sweats "all day long," as well as diarrhea, chills, nauseousness, and vomiting due to his liver disease. (Tr. 48–49, 79, 82, 88).

Plaintiff lives with his mother and father and spends much of his day watching television. (Tr. 59). He can read for short durations, walk about half a mile up to three times a week, and occasionally help his mother set the table, clean the kitchen and take out the trash. (Tr. 58, 71, 75–76).

*Medical History*

Between 1993 and 1996 the plaintiff received treatment from internest/gastroenterologist Dr. Michael Rosenthal, whose records indicate that the plaintiff has a history of I.V. drug use, methadone treatment, a positive test for hepatitis C, gastritis and esophageal reflux, two retinal detachments, hypertension, blind right eye and a compression fracture of the lumbar spine at L3. (Tr. 294–326).

*Plaintiff's Eyes*

In April, 1987, the plaintiff was involved in a car accident. As a result, he sustained corneal lacerations and retinal detachment in his right eye. (Tr. 187–188). On April 4, 1987, the plaintiff underwent surgery to repair his eye. On April 6, 1994, the retinal detachment reocurred and repair surgery was performed. (Tr. 194, 196). Following repair surgery in 1994, the plaintiff complained of pain, irritation, headache, light sensitivity, and lack of vision in the nose area. (Tr. 197, 199).

On March 17, 1995, the plaintiff underwent additional surgery after he complained of loss of vision and flashes in the right eye. (Tr. 205–07). He was diagnosed pre and post operatively with penetrating injury, retinal detachment, proliferative vitreal retinopathy, and cataract. (Tr. 226–27). On follow up visits the plaintiff complained of headaches, pain and seeing a black line in the center of his visual field. (Tr. 207–09). On May 25, 1995, the plaintiff complained of a scratching sensation on his right eye. Vision in his right eye was 1/200. (Tr. 217). The doctor recommended that no additional intervention be undertaken given the "poor visual prognosis." (Tr. 218).

Doctors Paramicci and Gariano were the plaintiff's treating ophthalmologists at Yale Eye Center from April, 1994 to February, 1998. (Tr. 473–477). They noted that the plaintiff suffers from chronic right retinal detachment, corneal decompensation, and extropia, which cause chronic pain in his right eye. (Tr. 473). They also noted mild myopia in his left eye, resulting in loss of depth perception and loss of peripheral vision. (Tr. 475). Attempts to surgically correct the right eye were deemed unsuccessful and the prognosis for improvement of vision in the right eye is poor.

On February 20, 1998, the plaintiff consulted Dr. Jane Olson, an ophthalmologist, about the possibility of removing the right eye and reconstructing the socket to relieve chronic pain from which he was suffering. (Tr. 471).

*Liver Problems*

In March, 1994, Dr. Rosenthal referred the plaintiff to Dr. Michael Fallon of the Yale Liver Clinic after plaintiff tested positive for hepatitis C. (Tr. 230). Dr. Fallen noted that plaintiff's liver disease was most consistent with chronic hepatitis C, but thought it was important to screen for other causes such as autoimmune, hemochromatosis, alpha–1 antitrypsin deficiency, or Wilson's disease. (Tr. 231). Dr. Fallon recommended medication known as Vasotec for the plaintiff's hypertension so long as his liver function tests were sufficiently normal. (Tr. 231). In a note dated April 20, 1994, Dr. Fallon noted that repeated studies and tests ruled out Wilson's disease as an underlying condition, and that he would consider interferon treatment after a liver biopsy and a drug detoxification program was completed. (Tr. 235).

In January, 1996, Dr. Victor Navarro took over the treatment of plaintiff's hepatitis. Dr. Navarro noted that the plaintiff had a history of depression. Without express authorization from the plaintiff's psychiatrist, Dr. Navarro was reluctant to prescribe interferon therapy because it is contraindicated in the presence of active depression. (Tr. 331).

*Chronic Pneumonia*

On May 3, 1995, the plaintiff was admitted to Yale New Haven Hospital with complaints of nausea, vomiting blood, and shortness of breath (Tr. 266). Upper GI testing revealed a hiatal hernia, erosive esophagitis and nonspecific gastritis. (Tr. 269). He was diagnosed with pneumonia (Tr. 267). He was discharged on May 9 with antibiotics. (Tr. 267).

Plaintiff was admitted to Middlesex hospital on June 3, 1995. (Tr. 343–351). Physical examination, x-rays, and lab studies confirmed right lower lobe pneumonia. (Tr. 346). Plaintiff was kept overnight and discharged the next day with antibiotics. (Tr. 353).

On October 13, 1995, the plaintiff returned to Middlesex hospital complaining of a 103 degree fever, difficulty breathing, coughing, shortness of breath, and chest pain. (Tr. 353). Chest x-rays on October 14, 1995 showed a left lower lobe consolidation. (Tr. 356). Plaintiff was diagnosed with pneumonia, kept overnight and discharged the next day with antibiotics. (Tr. 348–351).

On November 4, 1996, the plaintiff again complained of chest congestion. (Tr. 358). He was diagnosed with early stages of pneumonia and given antibiotics. (Tr. 358–9).

In February 1996, the plaintiff returned to Middlesex with recurring pneumonia symptons. (Tr. 362). Chest x-rays showed right middle and lower lobe infiltrates consistent with pneumonia. (Tr. 365). Clinical notes indicate that the plaintiff has had multiple pneumonias and that his symptoms always clear quickly with antibiotics. (Tr. 362). Notes also suggest that his pneumonias might be related to his hiatal hernia and reflux condition (Tr. 362).

Plaintiff returned to Middlesex on June 13, 1996, and August 2, 1996, with chest

pains and fever. (Tr. 369, 372). After both examinations the plaintiff was diagnosed with acute bronchitis and/or aspiration pneumonia. (Tr. 369–371, 372–373).

Plaintiff returned to Middlesex on August 17, 1996, complaining of chest pain. (Tr. 335). He was transferred to Yale New Haven Hospital, diagnosed with right lower lobe pneumonia and gastroesophageal reflux disease. (Tr. 335–337). After remaining for three days at Yale New Haven Hospital, the plaintiff was discharged with antibiotics. (Tr. 337).

In May 1997, the plaintiff went to the Yale New Haven emergency room with complaints of vomiting blood and rib pain from accidentally hitting his side against a sink. (Tr. 412–414, 420).

On October 20, 1997 the plaintiff was admitted to the Intensive Care Unit of Yale New Haven Hospital for complaints of shortness of breath and chest pain. He was treated for pneumonia, but had progressive multi-system organ failure while in the Intensive Care Unit. Specifically, he had acute liver and kidney failure with acute respiratory distress syndrome requiring intubation. (Tr. 468). Plaintiff was treated with antibiotics and discharged on November 14, 1997. (Tr. 468). His final diagnosis was pneumonia, acute renal failure, acute liver failure, elevated right hemidiaphragm, and C. Difficile colitis. (Id.). On a follow up visit in December 1997, the plaintiff was diagnosed with recurrent pneumonia secondary to aspiration, and was referred to the gastrointestinal department for continued symptoms of reflux. (Tr. 464).

*Psychiatric Problems*

Plaintiff underwent psychiatric care from November, 1994 through December, 1995. (Tr. 281–293). He reported symptoms of depression, anxiety and insomnia. Medication was prescribed for his complaints of insomnia and depression. (Tr. 293). In 1995, the plaintiff reported that his depression is exacerbated by the onset of fall and winter. (Tr. 283, 286). He also complained of occasional hypnogenic hallucinations. (Tr. 285, 293). Dr. Rao, the plaintiff's psychiatrist, diagnosed the plaintiff with Disorder Initiating and Maintaining Sleep and Major Depression, mild without psychoses (Tr. 293).

Plaintiff recently began psychiatric treatment with Dr. Peter Rothenberg. (Tr. 425–28). Dr. Rothenberg found that the plaintiff was "moderately impaired" in his ability to relate to other people, to respond to customary work pressures, and in his degree of constriction of interests. (Tr. 425–426). In June, 1997, the doctor noted that he had not enough time to render a complete evaluation of the plaintiff. (Tr. 426).

In July, 1997, the plaintiff was admitted to Backus Hospital after complaining of depression and wanting adjustments to his medication. (Tr. 430–35, 437). He was diagnosed with Major depression, recurrent; opioid dependence, currently controlled; dependent personality features (Tr. 439).

In January 1996, the plaintiff underwent an evaluation with Dr. Joseph Ayoub. (Tr. 327–330).

Two state agency physicians reviewed the evidence and evaluated plaintiff's mental residual functional capacity (Tr. 108–110, 133–135). The doctors found that the plaintiff was "moderately limited" in his ability to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, and to set realistic goals or make plans independently. (Tr. 108–109, 133–34). The other doctor noted problems with attention and following a work schedule. (Tr. 135).

## STANDARD OF REVIEW

The scope of review of a social security disability determination involves two levels of inquiry. The court must first decide whether the Commissioner applied the correct legal principles in making the deter-

mination. Next, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel,* 23 F.Supp.2d 179, 189 (D.Conn.1998). The court may not decide facts, reweigh evidence or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala,* 1 F.3d 571, 577 (7th Cir.1993). A court must review the entire record to determine the reasonableness of the ALJ's factual findings. *Schaal v. Apfel,* 134 F.3d 496, 504 (2d Cir.1998) "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. *See* 42 U.S.C. § 423(a)(1). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Determining whether a claimant is disabled requires a five-step process. *See* 20 C.F.R. § 404.1520. First, the court must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1510(b), 404.1572(b). If the claimant is currently employed, the claim is disallowed. *See* 20 C.F.R. § 404.1520(b). If the claimant is not working, as a second step, the agency must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is denied. *See* 20 C.F.R. § 404.1520(c). Once the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in appendix 1 of the regulations (the "Listings"). *See* 20 C.F.R. § 404.1520(d). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *Balsamo v. Chater,* 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(e). If the claimant cannot perform his former work, he must show, as a fifth and final step, that he is prevented from doing any other work. A claimant is entitled to receive disability benefits only if he cannot perform any alternate gainful employment. *See* 20 C.F.R. § 404.1520(f).

The initial burden of establishing disability is on the claimant. *See* 42 U.S.C. §§ 423(d)(5). Once the claimant demonstrates that he is incapable of performing his past work, however, the burden shifts to the Commissioner to show that the claimant has the residual functional capacity to perform other substantial gainful activity in the national economy. *See Balsamo v. Chater,* 142 F.3d at 80. This may require the application of the Medical–Vocational Guidelines ("the grid") which places claimants with severe exertional impairments who can no longer perform past work into grid categories according to their residual functional capacity, age, education and work experience, and dictates a conclusion of disabled or not disabled. *See* 20 C.F.R. § 404.1520(f). A proper application of the grid makes vocational testing unnecessary.

The grid covers only exertional impairments; nonexertional impairments, includ-

ing psychiatric disorders, are not covered. *See* 20 C.F.R. § 200.00(e)(2). If the grid cannot be used because nonexertional impairments are present, or exertional impairments do not fit squarely within grid categories, the testimony of a vocational expert is generally required to support a finding of residual functional capacity for substantial gainful activity. *See Bapp v. Bowen,* 802 F.2d 601, 605 (2d Cir.1986).

## DISCUSSION

Following the five step evaluation process, the ALJ determined that the plaintiff has a history of poly-substance abuse currently in remission, status post repaired detachment of the right retina, chronic hepatitis C and depressive disorder. The ALJ further found that the plaintiff does not have an impairment or combination of impairments listed in, or medically equal to one listed in the Commissioner's Listing of Impairments, (Tr. 25), that the plaintiff retains the residual functional capacity to perform work-related activities at the light exertion level and that the plaintiff's allegations of severe pain and resulting functional limitations were not fully credible in light of the medical and objective evidence. (Tr. 25). The ALJ also determined that despite impairments, he would be able to perform his past relevant work as a telephone market surveyor. (Tr. 25). The ALJ also considered the plaintiff's age, education and residual capacity in light of the Medical–Vocational Guidelines to determine that the plaintiff was not disabled within the meaning of the Social Security Act finding that there is a significant number of jobs in the national economy which he can perform. (Tr. 26).

### I. Credibility

■ It is the ALJ's function to evaluate the credibility of the claimant. *See Carroll v. Secretary of Health and Human Services,* 705 F.2d 638, 642 (2d Cir.1983). The ALJ is free to accept or reject testimony of any witness. *Gilliams v. Apfel,* 1999 WL 200698 (D.Conn.1999). A finding that the witness is not credible must be set forth with sufficient specificity to permit intelligible plenary review of the record. *Williams on Behalf of Williams v. Bowen,* 859 F.2d 255, 260–1 (2d Cir.1988).

■ Where pain or other subjective symptoms are alleged, a determination must contain a thorough discussion and analysis of the objective medical and other evidence. Such discussion and rational must also include a resolution of any inconsistencies in the evidence and set forth a logical explanation of the plaintiff's ability to work. *See Social Security Ruling 95–5p,* 1995 WL 670415.

■ The ALJ found that:

the claimant's subjective allegations of pain and functional limitations are not credible, in light of the objective medical evidence and his wide range of daily activities. Despite alleged poor vision, he continues to read, watch television, operate a rider lawn mower and trimmer [1], and walk significant distances: he does not meet the criteria for visual disability.

(Tr. 25). The Court finds that the ALJ's decision summarily finds that the plaintiff's claims of pain are not credible, cites a few specific daily activities of the plaintiff in support of that finding, and does not provide a sufficient finding that the subjective allegations of the plaintiff are not credible. There is no analysis or resolution of the inconsistencies relative to the plaintiff's daily activities and the medical evidence that tends to support the plaintiff's claims of pain. There is no explanation as to how the evidence leads to a finding that the plaintiff does not have pain that limits his ability to work, how the daily activities of watching TV, walking one block three times a week, occasionally riding a lawn mower, or reading "for not too long" demonstrates that the plaintiff's

---

[1]. The Court casts doubt on the ALJ's finding that the plaintiff uses a trimmer. Plaintiff does not admit to using a trimmer, but avers that his father uses it. (See Tr. 77).

claim of significant pain does not limit his ability to work at the light exertion level. Without such an analysis and explanation as to why the ALJ found that the medical and objective evidence leads to a finding that the plaintiff's pain is not credible and limits his ability to work, the ALJ's decision neither satisfies the requirements of SSR 95–5p nor makes it possible for this Court to determine whether it is supported by substantial evidence.

Upon remand, the ALJ shall set forth his findings on the issue of the credibility of the plaintiff's claim with specificity so that this Court is able to make its review.

### II. Equivalent of a Listed Impairment

■ The third step of the five part disability test requires a determination of whether a claimant has an impairment listed in Appendix 1 of the regulations. *See* 20 C.F.R. § 404.1520(d). "When a claimant's condition meets or equals a 'listed' impairment, there is a conclusive presumption that the claimant is disabled and entitled to benefits." *Dixon v. Shalala,* 54 F.3d 1019, 1022 (2d Cir.1995). For a claimant to sufficiently show that his unlisted impairment, or combination of impairments, is equivalent to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment. *Brown v. Apfel,* 174 F.3d 59, 64–65 (2d. Cir.1999) (citations omitted).

■ In determining that none of the plaintiff's impairments meet or equal the criteria of any listed impairments, the ALJ states in his decision that:

The claimant does not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1, Subpart P, Regulation No. 4.

(Tr. 25). In support of this finding, the ALJ does not cite any evidence, nor does he set forth the requirements of any listed impairment to point out the shortcomings of the evidence in relation to those require-ments. This Court finds that the record is replete with medical evidence which suggests that the plaintiff's recurrent pneumonia may equal the listing of bronchiectasis which is summarized as:

episodes of bronchitis or pneumonia or hemoptysis or respiratory failure requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each in patient hospitalization for longer than 24 hours for treatment counts as two episodes, and an evaluation of at least 12 consecutive months must be used to determine the frequency of episodes.

Listing, 20 Pt. 404, Subt. P, App. 1, section 3.07B. There is evidence that bronchiectasis was suspected as a cause of the plaintiff's respiratory distress. (Tr. 464). Furthermore, there is evidence that the plaintiff may also meet the hospitalization requirements of the listing. (Tr. 266–67, 335–337, 343–51, 353, 57, 358–59, 362, 366–68, 369–71, 466–469).

Therefore, because the ALJ flatly found that the plaintiff's unlisted impairment, or combination of impairments, was not equivalent to a listed impairment, and there is no language in his written decision reflecting a comparison of the symptoms, signs, and laboratory findings regarding plaintiff's pneumatic impairment with the medical criteria shown in the Listing as required by 20 C.F.R. Sec. 416.926(a), the ALJ failed to adequately consider whether plaintiff's impairments equaled bronchiectasis. Accordingly, the ALJ's decision will be vacated.

Upon remand the ALJ shall consider the issue of whether the plaintiff's symptoms resemble a listed impairment. *See Brown v. Apfel,* 174 F.3d 59, 64–65, (2d Cir.1999).

### CONCLUSION

■ Where there are gaps in the administrative record, a Court may remand the decision of an ALJ to the Commissioner for further development of the evidence. *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.

1996). For the reasons stated above, the plaintiff's Motion for Judgment on the Pleadings (Doc. # 7) is GRANTED to the extent that the decision of the Commissioner is reversed and the case is remanded for further proceedings consistent with this decision. Defendant's Motion for Order Affirming the Decision of the Commissioner (doc. # 11) is DENIED.